**Shane HECK, Plaintiff and Appellee,**

v.

**Cristie REED, Defendant and Appellant.**

Civ. No. 940117.

Supreme Court of North Dakota.

Feb. 28, 1995.

Patti J. Jensen of Lindquist & Jeffrey, Grand Forks, for defendant and appellant.

Shirley Faye Lawonn Jahnke, Grand Forks, for plaintiff and appellee.

LEVINE, Justice.

Cristie Reed appeals from a district court judgment awarding sole physical and legal custody of her two children to their father, Shane Heck. At issue in this appeal are the 1993 amendments to NDCC § 14–09–06.2(1)(j), in particular, the meaning and application of the language that there is "a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child" and that "[t]his presumption may be overcome only by clear and convincing evidence that the best interests of the child require that parent's participation as a custodial parent."

This is a case where the trial court, agreeing with the guardian ad litem, characterized both parents as having the ability to appropriately raise the children and as having great affection toward them. It then found that, although Shane had perpetrated domestic violence against Cristie, the presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of the children was rebutted by other factors. Because the trial court improperly applied NDCC § 14–09–06.2(1)(j), we hold that it was clearly erroneous for the trial court to find that the presumption against awarding sole or joint custody to a parent who has perpetrated domestic violence was rebutted, and we reverse and remand.

## FACTS

Cristie and Shane's relationship was tumultuous, fraught with numerous breakups and reconciliations. The parties began dating in 1989, when Cristie was sixteen and Shane was nineteen. The parties never married but lived together, off and on, for a period of two years, between November of 1990 and November of 1992. They have two children, Shana Rae Heck, born October 20, 1991, and Steven Shane Reed, born October 14, 1992. During the latter portion of their relationship, Cristie, Shane and the children lived in a mobile home on Shane's parents' farm in Walhalla, North Dakota, where Shane works with his father. After the parties separated for the last time, Shana remained in Walhalla with Shane, and Steven, an infant at the time, moved with Cristie to Grand Forks.

After several months, Shane initiated this action seeking sole custody of both Shana and Steven. Cristie counter-petitioned, also requesting sole custody of the children.

The trial court conducted a hearing during which it heard testimony from several witnesses, including Cristie, Shane, and the children's guardian ad litem. One of the trial court's findings of fact is that "Shane has physically and verbally abused Cristie[,]" but we are not told what conduct and speech were abusive. However, the trial court's comments to counsel during the course of the hearing clarify the nature of the abuse the trial court found as a fact. The trial court disclosed to counsel that it was going to find domestic violence and that counsel for Shane should, in effect, concentrate on producing evidence that would rebut the presumption against awarding custody to Shane. The court said:

"[Cristie] testified that hair was pulled from her head.... You are all concerned about domestic violence and the factors for custody. I think on this state of evidence ... she has testified to bad names and pulled hair and hitting her on her birthday and punching in the face and, '[Shane] has hit me more than once'—she has testified to. And there has been dismissals on a couple abuse charges. I think I am going to find domestic violence.... So, that obviously concerns you, Mr. Larivee.

.  .  .  .  .

"Now, the focus then has to be on the clear and convincing evidence of other things that point in his favor that overcomes his [sic] presumption." Tr. pp. 52–53.

The trial court appears to have found Cristie's testimony credible as to the nature and extent of domestic violence committed by Shane.[1] However, in its written findings, the trial court characterized this violence as "minimal" and also found that "[t]here is little likelihood of continued violence toward anyone." The trial court found significant that "there was never any abuse directed toward the children nor has it [had] an observable effect on them." The trial court noted that "[b]oth parents have the ability to raise the children appropriately, although Shane is the more interested and potentially better parent." The trial court also relied upon "the interaction of Shane's parents" with the children, Shane's "desire to provide for the children's needs," Shane's "more settled" living arrangement and "Cristie's smoking habits" to rebut the presumption against awarding custody to Shane, a parent who had perpetrated domestic violence.[2]

On appeal, Cristie argues that the trial court gave too little weight to the evidence of domestic violence and therefore, it was clearly erroneous for the trial court to find that the presumption against awarding custody to a perpetrator of domestic violence was rebutted.

## LAW AND ANALYSIS

■ A trial court's findings on matters of child custody are findings of fact which we will not reverse unless clearly erroneous. NDRCivP 52(a); e.g., Ludwig v. Burchill, 514 N.W.2d 674 (N.D.1994). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. Dalin v. Dalin, 512 N.W.2d 685 (N.D. 1994).

Before we can determine if the trial court's finding that the presumption against awarding custody to a perpetrator of domestic violence was rebutted is clearly erroneous, we must determine how the statute is to be properly applied. Section 14–09–06.2(1)(j), NDCC, says:

"j. Evidence of domestic violence. In awarding custody or granting rights of visitation, the court shall consider evidence of domestic violence. If the court finds credible evidence that domestic violence has occurred, *this evidence creates a rebuttable presumption that a parent who has perpetrated domestic violence may not be awarded sole or joint custody of a child. This presumption may be overcome only by clear and convincing evidence that the best interests of the child require that parent's participation as a custodial parent.* The court shall cite specific findings of fact to

1. In response to questioning at oral argument, Shane's appellate counsel, who did not try the case, agreed that the trial court presumably based its finding of domestic violence on three incidents of violence about which Cristie testified, namely, that Shane pulled her hair, punched her in the nose, and twisted her ankle severely, requiring her to seek medical treatment for pulled ligaments.

2. The trial court also adopted the following findings of the guardian ad litem in the findings of fact:
   "1.) [T]he continual health problems Steven was having and those not getting resolved until Shane made an appointment for him and took him to the doctor himself although Steven was living with Cristie,
   "2.) Cristie would on occasion bring Steven without adequate clothing, i.e. it was a cool day and he did not have any jacket or warm clothing to put on,
   "3.) I observed both parents failing to use seat belts in the car while transporting the children,

"4.) Cristie continuing to allow smoking in the car even after Steven was diagnosed with asthma,
"5.) Cristie allowing her boyfriend to spend evenings, including overnight with her when she had both children for the weekend,
"6.) [T]he inability for both parents to communicate and focus more time and energy disagreeing than trying to resolve issues, and
"7.) [T]he lack of promptness of Cristie when she was scheduled to be in Grafton to pick up the children."
At oral argument, the parties agreed that the guardian's concerns under numbers 3 and 6 did not favor either parent and that number 5 had also been rendered moot, because Shane presently has custody of the children and his present girlfriend lives with them. Nonmarital cohabitation by a parent does not automatically require awarding custody to the other parent. See Lapp v. Lapp, 293 N.W.2d 121 (N.D.1980).

show that the custody or visitation arrangement best protects the child and the parent or other family or household member who is the victim of domestic violence.[3] ... The fact that the abused parent suffers from the effects of the abuse may not be grounds for denying that parent custody...." [4] (Emphasis added.)

Interpretation of a statute is a question of law, fully reviewable on appeal. *State v. Beilke,* 489 N.W.2d 589 (N.D.1992). Our construction of section 14–09–06.2(1)(j) is guided by well-established canons of statutory interpretation. *See, e.g., Olson v. Director, N.D. DOT,* 523 N.W.2d 258 (N.D. 1994). Our duty, when we construe a statute, is to ascertain the legislature's intent. *State v. Pippin,* 496 N.W.2d 50 (N.D.1993). That intent may be ascertained from the face of a clear and unambiguous statute. NDCC § 1–02–05; *Beilke,* 489 N.W.2d at 592. When we construe a statute, words are given their plain, ordinary and commonly understood meaning, with consideration of "the ordinary sense of statutory words, the context in which they were enacted, and the purpose which prompted the enactment." *Id.*

Section 14–09–06.2(1)(j) has a familiar and lengthy history. *See Schestler v. Schestler,* 486 N.W.2d 509 (N.D.1992) [tracing the history of the statute's enactment and subsequent amendments]. In *Schestler, supra,* a majority of this court upheld a trial court's award of the custody of two minor children, Trista and Kristofer, to Charles Schestler, despite evidence that Charles abused their mother, Wanda, by hitting and shoving her, and that he inappropriately touched Wanda's two teenage daughters' breasts. The majority, agreeing with the trial court, found that any statutory presumption against awarding custody to Charles, a perpetrator of domestic violence, was sufficiently rebutted because:

1) Charles had never directed violence toward Trista or Kristofer;

2) Charles had a more stable home environment;

3) There was more love and affection between Charles and the children than

---

3. NDCC § 14–09–06.2(1)(j) also permits the court to award custody to a "suitable third person" if necessary "to protect the welfare of the child." However, that portion of the statute is not at issue in this appeal. The trial court found that "both parents have the ability to raise the children appropriately" and no one raises the necessity of a third-party placement.

4. Section 14–09–06.2(1) lists the following additional factors which may be considered by the trial court in an original custody proceeding:
"1. For purposes of custody, the best interests and welfare of the child is determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:
a. The love, affection, and other emotional ties existing between the parents and child.
b. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.
c. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.
d. The length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.

e. The permanence, as a family unit, of the existing or proposed custodial home.
f. The moral fitness of the parents.
g. The mental and physical health of the parents.
h. The home, school, and community record of the child.
i. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

k. The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household of a parent and who may significantly affect the child's best interests. The court shall consider that person's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault, on other persons.
l. The making of false allegations not made in good faith, by one parent against the other, of harm to a child as defined in section 50–25.1–02.
m. Any other factors considered by the court to be relevant to a particular child custody dispute."

existed between Wanda and the children;

4) There was an "adverse relationship" between the younger children and Tara and Tosha;

5) Charles' mother and her daughter would assist in providing care for the children; and

6) Wanda demonstrated some lack of care and concern for the children's safety. *Id.* at 512.

In *Schestler,* two statutory provisions were at issue, the pre-amended NDCC § 14–09–06.2(1)(j), which said:

"j. The existence of domestic violence. If the court finds that domestic violence has occurred, the court shall cite specific findings of fact to show that the custody or visitation arrangement best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm. As used in this subdivision, 'domestic violence' means domestic violence as defined in section 14–07.1–01."

and NDCC § 14–05–22(3), which said:

"In awarding custody or granting rights of visitation, the court shall consider evidence of domestic violence. If the court finds credible evidence that domestic violence has occurred, this evidence creates the rebuttable presumption that awarding custody or granting visitation to the abusive party is not in the best interests of the child."

*See Schestler,* 486 N.W.2d at 511. The majority reasoned that while these statutes required a trial court to consider domestic violence, that evidence was no more important than the other factors that the court must consider when making its custody decision. *Id.* The majority concluded that neither the statutes nor their legislative histories "indicate a priority for [domestic violence] over other statutory factors." *Id.*

Following *Schestler,* the legislature amended section 14–09–06.2(1)(j), 1993 S.L.N.D. ch. 144 § 2, and, in so doing, significantly changed its language. We presume that "[w]hen the legislature amends an existing statute, it indicates its intent to change the statute's meaning in accord with its new terms." *State v. Beilke,* 489 N.W.2d at 592. Because the statute was amended after this court construed the predecessor statute in *Schestler,* we may also presume that the legislature was responding to that construction. *See* Sutherland, Statutory Construction § 22.30.

"The legislature is presumed to know the prior construction of terms in the original act, and an amendment substituting a new term or phrase for one previously construed indicates that the judicial ... construction of the former term or phrase did not correspond with the legislative intent and a different interpretation should be given the new term or phrase." *Sutherland, supra.*

In *Schestler,* the majority considered the rebuttable presumption created under section 14–05–22(3), NDCC, as we consider other rebuttable presumptions. Under Rule 301(a), NDREv, a rebuttable presumption substitutes for evidence of the fact "until the trier of fact finds from credible evidence that the fact presumed does not exist." *See Schestler,* 486 N.W.2d at 512. Thus, under our prior law, the perpetrator of domestic violence bore the burden of proving by a preponderance of the evidence that the best interests of the children would be met by placing them in the perpetrator's custody. *See Estate of Zins ex rel. Kelsch v. Zins,* 420 N.W.2d 729 (N.D.1988). However, under the amended version of section 14–09–06.2(1)(j), the presumption against awarding custody to a parent who has perpetrated domestic violence may only be rebutted by clear and convincing evidence.

Clear and convincing evidence is a higher proof requirement than the preponderance of the evidence standard. *See In Interest of Kupperion,* 331 N.W.2d 22, 29 (N.D.1983) (Sand, J., concurring specially and dissenting); *In Interest of M.L.,* 239 N.W.2d 289 (N.D.1976). In specifically requiring that the presumption be rebutted only by clear and convincing evidence, the legislature imposed a higher burden on the perpetrating parent than that required under our previous law.

The question is what does it take to rebut the presumption against awarding custody to

a perpetrator of domestic violence? Under the prior statute, the trial court, after finding domestic violence, needed only to make specific findings that the custody arrangement "best protect[ed] the child." NDCC § 14–09–06.2(1)(j) (1992). The *Schestler* majority construed this phrase to mean that a trial court need only cite to the reasons it believed the best interests of the child would be served by the custodial arrangement. *Schestler*, 486 N.W.2d 509. The result of this construction was that proof of domestic violence carried no more weight than the other statutory factors and, indeed, could be overcome by any one or a combination of the other statutory factors. *See id.*

In amending subsection (j), the legislature placed the burden of proof on the perpetrator to prove that the best interests of the children *require* that the perpetrator be a custodial parent. NDCC § 14–09–06.2(1)(j). The use of the word "require" is a clear legislative signal that the presumption against awarding custody to a domestic violence perpetrator is not overcome merely by balancing the other factors slightly in the perpetrator's favor. The word "require" is a word denoting compulsion; it means to "insist upon" or "demand." *Webster's New World Dictionary*, 1208 (2d College Ed.1980). The legislature intended not only that domestic violence committed by a parent weigh heavily against that parent's claim for child custody, but that it be overcome only by clear and convincing evidence that the best interests of the children demand that the perpetrator of domestic violence serve as custodial parent.

Establishing that the best interests of a child *require* the perpetrator's participation as a custodial parent is akin to the standard used in custody modification cases. *E.g., Dalin v. Dalin,* 512 N.W.2d 685 (N.D. 1994). We will deny a motion to modify unless the reasons for transferring the child's custody are sufficiently compelling to justify

upsetting the stability of the child's relationship with the custodial parent. *Id.* at 687. We have also relied on a heightened standard of necessity or exceptional circumstances in custody cases in which a third party challenges a biological parent for custody of a child, stating that even a biological parent's paramount right to custody of a child must yield when exceptional circumstances indicate that the best interests of the child require placing the child's custody in an appropriate third party. *E.g., Patzer v. Glaser,* 396 N.W.2d 740 (N.D.1986). Although an abusive parent's right to custody of his or her child is more expansive, and substantially more protected than that of a third-party's right, we believe the third-party cases provide another illustration of our law's requirement in certain instances of exceptional circumstances to justify an award of custody. In a real sense, it takes compelling or exceptional circumstances under NDCC § 14–09–06.2(1)(j) to award custody to a perpetrator of domestic violence, and certainly something more than the customary weighing and reciting of the factors found in NDCC § 14–09–06.2(1)(a) through (i), (k), (*l* ). *Compare with Schestler,* 486 N.W.2d 509.

Cristie argues that the trial court misapplied the statute in finding that the presumption against awarding custody to Shane, a parent who has perpetrated domestic violence, was rebutted. She says that the trial court's reliance on Shane's personal stability and maturity,[5] Shane's parents' presence on the farm to assist him in caring for Shana and Steven, and Shane's greater desire to provide for the children's needs amounted merely to a weighing of the ordinary child custody factors. Under NDCC § 14–09–06.2, in an original child custody dispute, a trial court may properly consider the maturity of the parties and their disposition to provide the children with food, clothing, and medical care. NDCC § 14–09–06.2(1)(a), (b), (c). In addition, the stability

---

5. The trial court found that Shane's living arrangements were "more settled and should so continue" but made no finding as to the reason for the instability of Cristie's living arrangements. Cristie testified at the hearing that she had moved out of Shane's residence at least twice due to incidents of domestic violence.

NDCC § 14–09–06.2(1)(j) makes it impermissible to deny a parent custody because "the abused parent suffers from the effects of the abuse." To the extent that Cristie's living arrangements were destabilized by Shane's committing domestic violence, it is clear error to weigh against Cristie her unstable living arrangements.

of the parties' homes and family units and the potential interaction of third parties, such as grandparents, should be weighed by the trial court. *Id.* (1)(d), (e), (k). However, it is contrary to the plain language of § 14–09–06.2(1)(j) and clear legislative intent to permit a trial judge to find that both parents have the ability and affection to raise the children appropriately and then, to find that the statutory presumption against awarding custody to the parent who has perpetrated domestic violence is rebutted by weighing in the perpetrator's favor some of these remaining customary best-interests factors. Under section 14–09–06.2(1)(j), the statutory presumption against awarding custody to a perpetrator of domestic violence may be rebutted, in the case of two fit parents, only by compelling circumstances demonstrating that the best interests of the children require that custody be placed in the perpetrator.

■■■ Shane contends that in conjunction with consideration of the customary factors, the trial court's findings that Shane had never directed violence at the children nor had it had an observable effect on them, and that Cristie's smoking posed a potential harm to Steven, their asthmatic child, sufficiently rebut the presumption against awarding custody to a parent who has perpetrated domestic violence. We disagree.

We interpret NDCC § 14–09–06.2(1)(j) as precluding a court from weighing an absence of domestic violence against the children as one of the factors which may rebut the presumption against awarding custody to a perpetrator of domestic violence. Domestic violence is defined as "physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault . . . on . . . family or household members." NDCC § 14–07.1–01. Thus, under section 14–09–06.2(1)(j), the presumption against awarding custody to a perpetrator of domestic violence arises whenever violence is directed at *any* member of a household or family, not only when a child is the direct victim of the violence. If the legislature had intended a distinction be drawn between the adverse impact of the violence directed at a parent but not a child, it would not have defined "domestic violence" as harm to fami-

ly and household members, but would have used a more limiting phrase such as "child abuse." *See* NDCC § 50–25.1–02.

■■■ A court may take judicial notice of legislative facts when interpreting a statute, particularly when the statute is grounded in public policy. 2 McCormick on Evidence, 4th ed. §§ 328, 331. *See State v. Patzer,* 382 N.W.2d 631, 637 n. 4 (N.D.1986) [taking judicial notice of legislative facts in reviewing the constitutionality of the state's compulsory school attendance laws]. We believe that NDCC § 14–09–06.2(1)(j) reflects a legislative finding that domestic violence has an adverse effect on children which may be presumed whenever violence is present in the household.

The legislature, in amending section 14–09–06.2(1)(j) was surely aware of, and reacting to, the growing body of research which teaches that children are victimized by the climate of violence created by domestic violence between their parents, even if they are not direct targets of the abuse. Eighty-seven percent of children know about the incidence of domestic violence in their homes. Lenore Walker, *The Battered Woman Syndrome* 60 (1984). The majority of children witness the violence, either by seeing it or hearing it, even though their parents may be unaware that they have done so. Barbara Hart, State Codes on Domestic Violence: Analysis, Commentary and Recommendations, 43 Juv. & Fam.Ct.J. 79 (1992); Adele Harrell, *A Guide to Research on Family Violence,* The Urban Institute (1993).

■■■ However, children suffer harm even when they do not witness the violence. The United States Congress recognized this inherent harm to children whose parents perpetrate domestic violence on their partners when both the Senate and the House of Representatives unanimously passed House Concurrent Resolution 172 in October of 1990, which recommended to States that "credible evidence of physical abuse of a spouse should create a statutory presumption that it is detrimental to the child to be placed in the custody of the abusive spouse." H.Cong.Res. 172, 101st Cong., 2d Sess., 136 Cong.Rec. H8280–02 (1990). In passing this

resolution, Congress made a legislative finding that "even children who do not directly witness spousal abuse are affected by the climate of violence in their homes and experience shock, fear, guilt, long-lasting impairment of self-esteem, and impairment of developmental and socialization skills." H.Cong.Res. 172. Children of victims of domestic violence also suffer when the abused parent, who is generally their primary caretaker, cannot devote proper attention to the children's needs because of the abused parent's depression, low self-esteem, and low energy, not to mention the obvious physical injuries from domestic violence which can render victims bedridden or hospitalized. Karen Czapanskiy, Domestic Violence, The Family, and the Lawyering Process: Lessons from Studies on Gender Bias in the Courts, 27 Fam.L.Q. 247 (1993). Further, a child placed in the custody of a perpetrator of domestic violence remains at risk. More than fifty percent of perpetrators who batter their spouses will also batter their children and the pattern of spouse abuse usually precedes the abuse of the child. Hart, *supra.* Therefore, the court's finding that Shane's violence had no observable effect on Shana or Steven must be viewed in the context of the legislative findings of Congress and the statutory amendments by the legislature of our state that the long-term effects of violence in the home are adverse to children's best interests.

■ The legislature enacted section 14–09–06.2(1)(j) to ensure that domestic violence ·be taken seriously by the courts entrusted with the grave responsibility of making custody decisions. The statute is intended to counteract the myths that:

domestic violence is not a serious crime;

victims provoke or deserve the violence;

victims habitually lie or exaggerate the extent of violence; and

domestic violence is a private family matter.

*See Final Report of the Mich. Supreme Court Task Force on Gender Issues in the Courts* (1989); *see also* Harrell, *supra;* Czapanskiy, *supra.* NDCC § 14–09–06.2(1)(j) reflects our state public policy that a perpetrator of domestic violence is generally not a proper person to have custody of children because children are seriously and detrimentally affected by exposure to a parent who uses violence to exert control over family members. *See* Developments in the Law: Legal Responses to Domestic Violence, 106 Harv.L.R. 1498, 1608–11 (1993).

■ We know the legislature does not intend absurd or unjust results. *See Thompson v. Danner,* 507 N.W.2d 550 (N.D.1993). Yet, it would be both to interpret section 14–09–06.2(1)(j) as permitting the presumption against awarding custody to a parent who has perpetrated domestic violence to be rebutted because the domestic violence was perpetrated on another household member, and not the particular child. The legislature intended that courts *presume* that *any* domestic violence negatively impacts the best interests of the children. Therefore, it was clearly erroneous for the trial court to weigh the fact that "there was never any abuse directed toward the children" as one of the factors rebutting the presumption against awarding custody to a perpetrator of domestic violence.

The trial court also found that "there is little likelihood of continued violence toward anyone." We are mystified as to on which facts the court based this finding. It is possible that the court believed that Cristie provoked or deserved the physical abuse. However, this reasoning flies in the face of the things we know about perpetrators of domestic violence.

Domestic violence is "a pattern of assaulting and controlling behavior" committed by one household member against another. Anne Ganley, et al., The Impact of Domestic Violence on the Defendant and the Victim in the Courtroom, *Domestic Violence: The Crucial Role of the Judge in Criminal Court Cases. A National Model for Judicial Education,* The Family Violence Prevention Fund, 1991. Domestic violence is not caused by stress in the perpetrator's life, alcohol consumption, or a particular victim's propensity to push a perpetrator's buttons. Ganley, *supra.* Rather, domestic violence is a learned pattern of behavior aimed at gaining a victim's compliance. Ganley, *supra.*

Perpetrators can "unlearn" the pattern of domestic violence; however, this requires sufficient motivation for changing their violent behavior. Ganley, *supra*. The most recent episode of domestic violence by Shane occurred less than two years prior to the custody hearing. Shane introduced no evidence at the hearing that he had considered or participated in any form of treatment program or counseling related to domestic violence. Absent such proof of rehabilitation, it was clearly erroneous to conclude, as the trial judge did here, that Shane will no longer use domestic violence as a means of controlling his intimate partners.[6]

Next, we turn to the trial court's consideration of Cristie's smoking habits as one of the factors to rebut the presumption against awarding custody to a perpetrator of domestic violence. Section 14–09–06.2(1)(c) permits a trial court to consider the disposition of the parents to care for a child's medical needs. In addition, a trial court may consider any and all factors it deems relevant under § 14–09–06.2(1)(m). Therefore, a trial court does not err in considering the effect of any parental habit on the best interests of the child.

The trial court found that Cristie is a smoker and that she smokes in the presence of the children. Shane and the guardian ad litem testified that Steven has asthma and that passive or secondhand smoke aggravates his condition. We do not disagree with the trial court's consideration of the potential deleterious health effects of tobacco smoke on an asthmatic child; however, we do not believe that the legislature intended that the presumption against awarding custody of children to a perpetrator of domestic violence

be trumped by the fact that the victim-parent smokes.

Some courts have relied on the effects of secondhand smoke on an asthmatic child to tilt the balance in favor of one parent. *Lizzio v. Lizzio*, 162 Misc.2d 701, 618 N.Y.S.2d 934 (N.Y.City Fam.Ct.); *Wilk v. Wilk*, 781 S.W.2d 217 (Mo.Ct.App.1989); *Mitchell v. Mitchell*, 1991 WL 63674 (Tenn.App.). Others have refused to award custody to a nonsmoking parent or modify an original custody award on the ground that the custodial parent smokes tobacco. *Cooley v. Cooley*, 643 So.2d 408 (La.App. 3rd Cir.1994); *In re Marriage of Diddens*, 255 Ill.App.3d 850, 625 N.E.2d 1033 (3 Dist.1993); *Helm v. Helm*, 1993 WL 21983 (Tenn.App.). Regardless, domestic violence was not a factor in any of the cases in which the trial court awarded custody to a nonsmoking parent, based on the effects of passive smoke on an asthmatic child. *Lizzio*, 162 Misc.2d 701, 618 N.Y.S.2d 934; *Wilk*, 781 S.W.2d 217; *Mitchell*, 1991 WL 63674. We are confident that these courts would have analyzed the cases differently had they found that the nonsmoking parent was a perpetrator of domestic violence.

Another approach taken by a number of jurisdictions, facing a parent who smokes, and a child who suffers from asthma, is to opt in favor of ordering the parent to prevent smoking in the presence of the child, before cutting off that parent's custodial or visitation rights. *Shumaker v. Andrews*, 1992 WL 510196 (Del.Fam.Ct.); *Badeaux v. Badeaux*, 541 So.2d 301 (La.Ct.App. 5th Cir. 1989); *Unger v. Unger*, 274 N.J.Super. 532, 644 A.2d 691 (1994). We believe that this approach ordinarily is the more sensible, and

---

6. Scholars suggest that without intervention by a court or treatment program, it is likely that a perpetrator of domestic violence will continue to be violent in consecutive relationships. *E.g.*, Anne Ganley, et al., The Impact of Domestic Violence on the Defendant and the Victim in the Courtroom, *Domestic Violence: The Crucial Role of the Judge in Criminal Court Cases. A National Model for Judicial Education*, The Family Violence Prevention Fund, 1991; Catherine F. Klein, Leslye E. Orloff, Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law, 21 Hofstra L.Rev. 801, 1189 (1993) (citing study indicating that ninety-

five percent of men who sought treatment for battering behavior admitted abusing more than one partner). But *cf.*, Lenore E. Walker & Angela Browne, Gender and Victimization by Intimates, 53 J.Personality 177 (1985) [at least half of batterers who complete treatment programs continue their violent behavior with new partners]. Although treatment is not a fail-safe remedy, it may, in certain circumstances, support a finding that domestic violence is not likely to occur in the future. *See also Morstad v. State*, 518 N.W.2d 191 (N.D.1994) (Levine, J., concurring specially).

in a case of domestic violence, a necessary accommodation of legislative intent. A trial court, concerned about the ill effects of secondhand smoke upon an asthmatic child, should first prohibit the nonperpetrating parent who smokes from smoking or allowing others to smoke in the presence of the child. Our conclusion comports with our analogous case law concerning parental obstruction of visitation rights of the noncustodial parent. *Blotske v. Leidholm,* 487 N.W.2d 607 (N.D. 1992). Although obstruction of visitation may pose harm to both the child and the noncustodial parent, we opt first for imposing a rigid visitation schedule upon the parties, before modifying custody outright. *Id.*

▆▆ Section 14–09–06.2(1)(j), NDCC, reflects the public policy of our state that a perpetrator of domestic violence is generally not a proper person to have custody and the presumption against awarding that parent custody of the children may be overcome only by compelling circumstances, not present in this case.

The trial court's finding that the statutory presumption against awarding custody of the children to a perpetrator of domestic violence was overcome is clearly erroneous, and accordingly, we reverse and remand for the trial court to reconsider its award of custody in light of this opinion.

MESCHKE, J., concurs.

VANDE WALLE, Chief Justice, concurring in result.

I concur in the result. It appears to me that the Legislature, or at least as the majority construes the legislative amendments following the decision in *Schestler v. Schestler,* 486 N.W.2d 509 (N.D.1992), requires that the perpetrator of domestic violence not be awarded custody of a child unless the other parent is unfit. A court awarding custody to the perpetrator of domestic violence surely cannot find the other parent fit for purposes of the statute. Rather, it will be necessary to detail the failings of the abused rather than the virtues, if they exist, of the abuser. Whether or not I agree with the effect of the legislation, I understand its rationale.

I agree with the majority that the fact a child does not witness violence does not weigh in favor of the abuser. Neither does the fact the child is not abused weigh in favor of the abuser, although we are relieved there is no physical abuse of the child. Notwithstanding section 14–09–06.2(1)(j), NDCC, abuse of the child would be grounds for terminating parental rights of the abuser, section 27–20–44, NDCC, or at least placing custody of the child with the non-abusing parent. *See* section 14–09–06.2, NDCC, [other factors for determining the child's best interests].

Because of the lasting effects of domestic violence on a child, whether or not the child is abused or views the violence, as discussed in the majority opinion, I note the provisions of section 14–09–06.2(1)(k):

"The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household of a parent and who may significantly affect the child's best interests. The court shall consider that person's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault, on other persons."

A custodial parent who has a continuing relationship with a perpetrator of domestic violence should expect to have custody of that child transferred to the non-custodial parent unless there is clear and convincing evidence that the best interests of the child require the continued participation as a custodial parent.

SANDSTROM, Justice, concurring in the result.

I concur in the result of sending this case back to the trial court for specific findings and reconsideration as may be appropriate.

The trial court could have made clearer findings, and clearly the legislature intended a high level of compelling evidence to award custody to a perpetrator of domestic violence. I cannot agree with the majority's imputation of ill motives and ill thoughts to the trial judge. I also do not agree with the majori-

ty's trivializing the harm of cigarette smoke to an asthmatic child.

The majority heavily supplements the record. I agree legislative facts may be considered to interpret an ambiguous statute. 2 McCormick on Evidence, 4th ed. §§ 328, 331. The majority goes far beyond this to use "articles" to create evidentiary facts. The majority's "experts" were never called at trial, were never qualified or cross-examined. *See* Rules 702–705, N.D.R.Evid. The majority relies heavily on an article by Anne Ganley. Many of the "facts" from Ganley are not legislative facts, they are evidentiary facts. Though some are appealing, they are not in the record, and may or may not be true. Some appear to reflect inflexible stereotyping.

A fair reading of the record indicates the trial court did not totally accept Cristie Reed's version of the facts. The trial court found minimal domestic violence by Shane Heck, and concluded that was sufficient to create the presumption. The trial court then found the presumption had been overcome. The record—a letter from Cristie Reed apologizing to Shane Heck for hitting him—also reflects domestic violence by her against him.

The record further reflects that a medical doctor told Cristie Reed smoking in the presence of her asthmatic child threatened his health. Although she swore under oath she did not smoke in the asthmatic child's presence nor permit others to do so, two of her own witnesses testified to seeing her and others smoke in the child's presence. Under N.D.C.C. § 14–07.1–01, domestic violence includes "physical harm." Smoking in the presence of an asthmatic·child whose health is thereby threatened may well constitute such physical harm. If it does, a judge's order should not be necessary to create an obligation to stop smoking in the child's presence.

NEUMANN, J., concurs.