*302 OPINION OF THE COURT
Robert F. Julian, J.
Relief Requested:
The 13-year-old child (date of birth: June 28, 1988) of this marriage, Nicholas D., applies to the court for a ruling that he not be exposed to environmental tobacco smoke (ETS) while visiting his mother during court ordered visitation.
Questions Presented:
(1) Does environmental tobacco smoke pose sufficient risk that a parent, upon a complaint from a child, should be ordered to refrain from smoking or allowing smoking at any time in a house or car that the child will occupy?
(2) May the court utilize judicial notice for the purpose of determining the risk of environmental tobacco smoke and to establish a plan regarding exposure thereto?
(3) May the court order a smoke-free environment for the child?
Holding:
Counsel is notified in this decision that the court will take judicial notice of certain scientific evidence which forms the basis of the proposed ruling that environmental tobacco smoke is a dangerous carcinogen and poses other significant health risks sufficient to order that both parents maintain a smoke-free environment. The parents would be banned from smoking or allowing others to smoke at any time in their homes or their automobile. Either party may refute or contest the proposed scientific evidence and the proposed decision by requesting a hearing within 30 days of this decision and order. If no objections are made or a request for a hearing received, then the decision will become final and the Law Guardian is directed to prepare a final order and present the same to the court on notice to the parties.
Procedural Status/Facts
The court on its own motion grants the parties anonymous status for the purpose of this motion including any hearing requested pursuant to this decision, and any order ultimately issued.
By letter to the court dated August 21, 2001, and in an in camera proceeding subsequent thereto, Nicolas D., age 13, complains of maternal smoking during his court ordered visitations. Nicholas resides primarily with his father and *303 paternal grandparents and has overnight visitations with his mother pursuant to stipulation. The parties are presently litigating equitable distribution and other economic issues.
The court pursuant to that complaint ordered the defendant to cease smoking in her son’s presence pendente lite and a hearing on the issue was held. The defendant testified that she did indeed smoke both in the marital residence, and now in her separate apartment, although her indoor smoking activity was, in her view, primarily confined to the winter time. This is at variance with the testimony of Nicholas who testified in camera that his mother smokes in the bathroom during all of his visitations and that the house smells of smoking. Nicholas further advised the court in his letter that his mother smokes in her car. The father does not smoke, the paternal grandparents do not smoke, and smoking does not occur in Nicholas’ primary residence.
I. The Rights of the Parents and the Child
Visitation is the joint right of both the noncustodial parent and the child. (Weiss v Weiss, 52 NY2d 170 [1981].) The best interests of the child are furthered by the child being nurtured and guided by both of his or her natural parents. (Matter of Rodriguez v Gasparino, 218 AD2d 739 [2d Dept 1995], lv denied 86 NY2d 709, rearg denied 87 NY2d 862 [1995].) In visitation disputes, like custody matters, the best interests of the child is the controlling factor, (Eschbach v Eschbach, 56 NY2d 167 [1982].)
The State is parens patriae (parent of the country) and has broad authority to regulate and control the helpless, infirm, and infants within its jurisdiction. The extent of authority and the role of the court in exercising this function was explained by Justice Cardozo in Finlay v Finlay (240 NY 429, 433-434 [1925]):
“The chancellor in exercising his jurisdiction upon petition does not proceed upon the theory that the petitioner, whether father or mother, has a cause of action against the other or indeed against any one. He acts as parens patriae to do what is best for the interest of the child. He is to put himself in the position of a ‘wise, affectionate and careful parent’ (Queen v. Gyngall, supra), and make provision for the child accordingly. He may act at the intervention or on the motion of a kinsman, if so the petition comes before him, but equally he may act at the instance of any one else. He is not adjudicating *304 a controversy between adversary parties, to compose their private differences. He is not determining rights ‘as between a parent and a child’ or as between one parent and another (Queen v. Gyngall, supra). He ‘interferes for the protection of infants, qua infants, by virtue of the prerogative which belongs to the Crown as parens patriae.’ ”
“The courts, in their parens patriae role, are an arm of the State serving the important societal function of protecting children, even from their parents if necessary.” (Stephanie L. v Benjamin L., 158 Misc 2d 665, 669 [Sup Ct, NY County 1993].) And it is indeed the. courts that exercise the parens patriae function, and it is that role this court must exercise vis-a-vis Nicholas. (Koppenhoefer v Koppenhoefer, 159 AD2d 113 [2d Dept 1990]; Schneider v Schneider, 127 AD2d 491 [1st Dept 1987].)
This does not mean that the power of the state, vis-a-vis the natural parent, is unlimited. (Matter of Bennett v Jeffreys, 40 NY2d 543 [1976].)
“The State is parens patriae and always has been, but it has not displaced the parent in right or responsibility. Indeed, the courts and the law would, under existing constitutional principles, be powerless to supplant parents except for grievous cause or necessity (see Stanley v Illinois, 405 US 645, 651). Examples of cause or necessity permitting displacement of or intrusion on parental control would be fault or omission by the parent seriously affecting the welfare of a child, the preservation of the child’s freedom from serious physical harm, illness or death, or the child’s right to an education, and the like * * *
“[I]n the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude * * * .” (Id. at 545-546.)
The extent to which the state will interfere with parental activity and control in its capacity as parens patriae is great when the perceived risk to the child is great. With regard to health care, the state will intervene even to the extent of overriding the religious convictions of the parents. No element of American liberty is more highly cherished or jealously guarded *305 than religious freedom, yet in its role as parens patriae, and for the protection of the health and welfare of children, the state may and will contravene a family’s religious beliefs and obligations. See Prince v Massachusetts (321 US 158, 166 [1944]):
“And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth’s well being, the state as parens patriae may restrict the parent’s control by requiring school attendance, regulating or prohibiting the child’s labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child’s course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. People v. Pierson, 176 N.Y. 201, 68 N.E. 243, 63 L.R.A. 187, 98 Am.St.Rep. 666.”
Hence, in Matter of Sampson v Taylor (29 NY2d 900 [1972]), the Court of Appeals affirmed a Family Court order requiring a 15 year old to be provided a blood transfusion, if medically indicated, so that some required surgery could be safely performed. (See also Matter of Storar, 52 NY2d 363 [1981].) In T.D. v New York State Off. of Mental Health (228 AD2d 95, 124 [1st Dept 1966]) the Court wrote:
“We are not dealing here with parental choice among reasonable treatment alternatives, but with a decision to subject the child to nontherapeutic treatments and procedures that may cause harmful permanent or fatal side effects. It follows therefore that a parent or guardian, let alone another adult who may be a member of the child’s family, may not consent to have a child submit to painful and/or potentially life-threatening research procedures that hold no prospect of benefit for the child and that may have the same result as a denial of necessary medical treatment.”
The plaintiff’s interest in unhampered cigarette smoking cannot be said to be greater than the religious interests advanced by others wishing for parental judgment to overcome a child’s best interests. If pursuant to Nicholas’ complaint there is a showing of maternal smoking, that the maternal smoking *306 is causing exposure to environmental tobacco smoke, and that it creates a health risk to the child, which is to say if it is “painful and/or potentially life-threatening [and] hold[s] no prospect of benefit for the child and that may have the same result as a denial of necessary medical treatment,” i.e., morbidity or mortality, then the court is empowered to and will order a cessation or modification of that conduct to protect the child’s health and well-being.
II. The Court’s Duty
Environmental tobacco smoke is also known as “second-hand smoke.” It is the smoke breathed by a nonsmoker as a result of smoking by others. The court, in exercising its duty as parens patriae of Nicholas, must consider the health risks associated with the present plan of visitation given the presence of environmental tobacco smoke in the plaintiffs household.
Nicholas, who was interviewed by the court in camera with his Law Guardian present, is bothered by cigarette smoke and objects to the exposure to environmental tobacco smoke he endures during visitation in his mother’s car and apartment. The plaintiff contends that Nicholas’ complaint is a tactic to thwart visitation. Whether a tactic or not, motive is irrelevant if the behavior complained of poses a significant risk of harm to Nicholas. The health issues associated with Nicholas’ complaint must be examined to determine if exposure to environmental tobacco smoke poses significant risk.
The court does not have a budget that would allow for the retention of an independent expert to explore this issue in the discharge of its duties as parens patriae and the parents’ economic capacity to fund such an expert inquiry is limited. However there is a substantial body of literature published in scientific journals, books, and legal journals that address the issue of environmental tobacco smoke, its risk and management.
Since Nicholas’ birth, the public level of awareness about the risk of environmental tobacco smoke has grown exponentially. In the last decade, the societal pendulum has swung away from smoker dominance in all social settings toward the “right” to be smoke-free. New York is one of many states that have placed significant limitations on where people can smoke and in what circumstances.[1] Indeed the New York State Legislature has declared “that breathing secondhand smoke is a significant *307 health hazard for nonsmokers.” (L 1989, ch 244, § 1, reprinted following Public Health Law § 1399-n.) The Legislature further declared that “it is in the best interests of the people of this state to protect nonsmokers from involuntary exposure to second-hand tobacco smoke in indoor areas open to the public, food service establishments and places of employment.” (Id.)
The issues raised by Nicholas in this case are: (1) Is there a health risk from environmental tobacco smoke exposure? (2) Can the level of risk be clearly defined? (3) What are the parameters of acceptable exposure, if any? (4) Does Nicholas have a right to be free from ETS as part of his custody/ visitation scheme? (5) If there are risks, what should the court order to reduce or eliminate those risks during visitation? A few New York courts have confronted only certain aspects of these questions.
New York courts have held that parental smoking in the household is prohibited where a child has a diagnosed allergy to environmental tobacco smoke. (Matter of Lizzio v Lizzio, 162 Misc 2d 701, affd 226 AD2d 760 [1996]; see also, Matter of Lamirande v Lamirande, 251 AD2d 1071 [4th Dept 1998] [ordering parents not to smoke in the presence of their children] ; Roofeh v Roofeh, 138 Misc 2d 889 [Sup Ct, Nassau County 1988] [limiting smoking to outside the presence of the child].)[2]
Courts in other states have considered limited aspects of this issue as well. A New Jersey court ordered no smoking in any area of the house or car for eight hours prior to the visit of the children based on risks of ETS and a child’s coughing and respiratory problems. (Unger v Unger, 274 NJ Super 532, 644 A2d 691 [1994].) A Pennsylvania court has held that a father may not smoke in his home 48 hours prior to visitation by his three year old who has a sinus condition aggravated by secondhand smoke. (Strathman v Foster, Ct of Common Pleas, Erie County, Pa, Mar. 21, 1991, No. 446-A-1990.) A Louisiana court held that smoking was prohibited in a child’s presence. (Stewart v Stewart, 705 So 2d 802 [La 1998].) In Tennessee, *308 parents were ordered not to smoke in enclosed space with children present including house and car. (Smith v Smith, 1996 WL 591181, 1996 Tenn App LEXIS 655 [Tenn Ct App 1996].) In North Dakota a court held that a parent smoking in presence of an asthmatic child should be prohibited by the trial court as a predicate for custody. (Heck v Reed, 529 NW2d 155 [ND 1995].)
The court is unaware of any decision in any jurisdiction that has ordered the parties to maintain a smoke-free environment based upon the risks of exposure to environmental tobacco smoke without an underlying diagnosis such as allergy or asthma. Nicholas does not have asthma or any presently diagnosed condition associated with environmental tobacco smoke. The court is also unaware of any decision that orders parents to maintain a smoke-free environment upon the complaint of the child and his/her law guardian.
III. Judicial Notice of Certain Scientific Facts and a Ruling That is Based Thereon is Proposed to the Parties Subject to Objection and a Hearing
Because of a lack of resources and the absence of case law dealing with a comparable fact situation and motivated by its duty as parens patriae, the court conducted its own review of the medical and scientific literature utilizing the evidentiary doctrine of judicial notice. As a result of this review, the court here advises the parties that it will take judicial notice of certain medical journals and scientific evidence as set forth below unless the parties request a hearing for the purpose of determining the admissibility and truth of some or all of the texts and/or scientific principals that will be set forth below. The court’s utilizing judicial notice for the purpose of discharging its parens patriae responsibility is consistent with a leading commentator’s view of the use of judicial notice:
“To transform the fiction of the supposed knowledge of the judge into reality, he is permitted to inform himself in any way he deems best, and from any source which he regards as safe and proper. He may refer to calendars, dictionaries, encyclopedias, geographies and other books, or even contact the state department for required information and is specifically authorized by statute to ‘consider any testimony, document, information or agreement on the subject whether offered by a party or discovered through its own research.’ ” (Fisch, New York Evidence § 1068, at 605-606 [2d ed].)
*309 Certain of the sources set forth below are government publications. Others are published scientific texts which the court facially regards as propounding a “principle (which) is accepted as a valid one in the appropriate scientific community.” (2 McCormick, Evidence at 378 [5th ed]; People ex rel. Butler v McNeill, 30 Misc 2d 722 [Sup Ct, Dutchess County 1961].) The court regards said scientific reports and data as facially “safe and proper” opinions and authorities, subject to any objection and/or impeachment by the parties. (Brown v Piper, 91 US 37, 42 [1875]; People v Cooper, 219 AD2d 426 [1st Dept 1996].)
Because no exact standard or mechanism exists in New York for the taking of judicial notice in a circumstance such as the case at bar, the court accepts and applies the following standards:
“The American Law Institute’s Code of Evidence sets up adequate safeguards: (a) by requiring that the party requesting judicial notice furnish the judge sufficient information and give each adverse party notice necessary to enable him to meet the request; (b) by providing that the judge shall decline to take judicial notice of a matter unless it clearly is indisputable; (c) by directing the judge, where the fact would in the absence of judicial notice be determined by the trier of fact, to direct the jury to find the matter as judicially noticed, or, in a nonjury case, to include in the record of the trial a statement of the matter so noticed; (d) by making it mandatory that the judge inform the parties of the tenor of any matter to be judicially noticed by him and afford each of them reasonable opportunity to present to him information relevant to the propriety of taking such judicial notice or to the tenor of the matter to be noticed; and (e) by allowing both the trial judge in proceedings subsequent to trial and the reviewing court to take judicial notice, but requiring in such event that the parties be afforded reasonable opportunity to present information relevant to the propriety of taking such judicial notice and to the tenor of the matter to be noticed.” (Morgan, Judicial Notice, 1944 Harv L Rev, 292-293 [footnotes omitted].)
The procedural principals outlined above are consistent with CPLR 4511 (d), the statute which governs judicial notice of law.
The court will take judicial notice, subject to the interposition of written objections by a party and a written *310 request for a hearing, of the following scientific articles, their contents, and the scientific principals and statements set forth below as the basis for holding that ETS does pose a significant health risk to children and thus to this child. Even though Nicholas does "not presently have asthma, exposure to environmental tobacco smoke apparently significantly increases his risks of developing, either as a child or as an adult, asthma, coronary artery disease, lung cancer, and certain chronic respiratory disorders, to name the most significant conditions. If no objection/hearing request is interposed within 30 days of this decision, the court will conclude that the best interests of Nicholas dictate that he shall not reside in, or visit, or occupy any residence or motor vehicle of the parties in which smoking of any type occurs at any time and that he shall be in a smoke-free environment to the extent practical outside of the home. The court proposes the foregoing ruling and proposes to take judicial notice of the scientific principals and literature which support said holding.
IV. Scientific Principals and Articles Proposed for Judicial Notice
The scientific issues raised by Nicholas are narrowed to two basic questions: (1) Is ETS a health risk, and (2) if so, are any levels of exposure acceptable?
A. Proposed Texts and Scientific Principals for Judicial Notice on the Issue of the Health Risks of ETS
The court proposes to take judicial notice of the following:
(1) ETS has been classified as a carcinogen. (USEPA, Environmental Protection Agency [EPA] Publication No. EPA/ 600/6.90/006F, EPA Office of Research and Development Office of Health and Environmental Assessment [1992] .)[3] ETS is responsible for the death of 3,000 Americans per year as a *311 result of lung cancer and is a type A (known human) carcinogen. (Environmental Protection Agency Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders [1992].) The overall cancer risk was greater for individuals with exposures to environmental tobacco smoke during both childhood and adulthood than for individuals with exposure during only one period. (D.P. Sandler, Cumulative Effects of Lifetime Passive Smoking on Cancer Risk, Lancet, a:312-315 [1985]; American Academy of Pediatrics Policy Statement Environmental Tobacco Smoke: A Hazard to Children, vol 99, at 639-642 [1997].)
(2) The children of parents who smoke are hospitalized for bronchitis and pneumonia during their first year of life more often than the children of nonsmokers. The children of parents who smoke are more likely to suffer from a variety of acute respiratory illnesses and infections, including chest illnesses, bronchitis, tracheitis, and laryngitis, during the first two years of their lives than the children of nonsmokers. In addition, chronic cough and phlegm are found more frequently in children of parents who smoke than in children of parents who do not smoke. Studies have detected decreased pulmonary function in those children of parents who smoke when compared to children of parents who do not smoke. (US Dept of Health & Human Services, Public Health Services, the Health Consequences of Involuntary Smoking: A Report of the Surgeon General, 125-37 [1986].)
(3) Environmental tobacco smoke related heart disease is believed responsible for approximately 37,000 nonsmoker deaths each year. (Stanton A. Glance and William W. Parmley, Passive Smoking and Heart Disease: Epidemiology, Physiology and Biochemistry, 83 Circulation 1 [1991].) Childhood exposure to environmental tobacco smoke has been identified as a possible cause of premature coronary artery disease (William B. Moskowicz, Lipoprotein and Oxygen Transport Alterations and *312 Passive Smoking Pre-adolescent Children, The MCV Twin Study, 81 Circulation 596 [1990]). Passive smoking has also been reported to alter lipid profiles in adolescents establishing a possible mechanism of increased coronary heart disease in passive smokers. (J. Feldman, Passive smoking alters lipid profiles in adolescents, Pediatrics: 88: 259-264 [1991]; American Academy of Pediatrics Policy Statement Environmental Tobacco Smoke: A Hazard to Children, 99 Pediatrics, at 637 [1997].)
(4) Environmental tobacco smoke exposure was responsible for between 150,000 and 300,000 annual cases of bronchitis and pneumonia in infants and young children up to 18 months of age. Environmental tobacco smoke exposure may cause asthma in children and increases the severity of symptoms in children with asthma; their estimate of this category being that between 200,000 and 1,000,000 asthmatic children have their condition worsened by exposure to ETS each year. (Environmental Protection Agency, Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders [Mar. 1, 1992].)
(5) Childhood exposure to environmental tobacco smoke can result in the same adverse health consequences as adult exposure, if not worse. Approximately one out of every five instances of lung cancer in nonsmokers could be attributed to childhood ETS exposure. (Janerich, Lung Cancer and Exposure to Tobacco Smoke in the Household, 323 New Eng J Med 632, 634; Environmental Protection Agency, Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders [Mar. 1, 1992].)
B. Proposed Holding Based Upon Material Proposed for Judicial Notice
From the foregoing, absent objection and a hearing, the court will hold that environmental tobacco smoke exposure poses a significant health risk to Nicholas, placing him at increased risk for the development of lung cancer, coronary artery disease, asthma, and other pulmonary dysfunction.
C. Proposed Texts, Government Reports, and Scientific Principals and Articles Relied Upon to Take Judicial Notice on the Issue of Acceptable ETS Exposure Levels
Therefore, the next issue necessarily before the court is under what circumstances, if any, is the exposure of Nicholas to *313 environmental tobacco smoke by either parent an acceptable health risk, and what specific parameters of exposure, if any, are acceptable?
The court proposes to take judicial notice of the following:
(1) One of the most recent publications on the risks of environmental tobacco smoke is entitled Environmental Tobacco Smoke by Watson and Whitton (2001 CRC Press), inter alia:
“Cigarette smoking is a leading cause of morbidity/ mortality and Environmental Tobacco Smoke, ETS, exposure is associated with lung cancer. ETS has been classified as a carcinogen (USEPA EPA Publication No. EPA/600/6-90/006F US EPA Office of Health and Environmental Assessment 1992) and is linked to pulmonary and ear diseases and sudden death in infants. ETS has been estimated as the third leading preventable cause of death.
“The Centers for Disease Control (CDC) reported the prevalence of children’s ETS exposure in the home ranging from 11.7 to 34.2% of children occurs states, based upon numbers of homes with adult smokers where smoking was allowed in some or all areas. Most smokers are of child rearing age leading to as many as 50% of children exposed in homes. National Health and Nutrition Examination Survey (NHANES) data indicated that 43% of U.S. children lived in a home with at least one smoker. Huss & Associates found 56% of families with an asthmatic child, included a smoker. Prevalence estimates vary yet suggest residential exposure to a substantial number of children.
“These rates may be underestimates due to measurement error. For instance, Repace and LoFroth have suggested that true protection for ETS exposure is not likely unless smoking takes place exclusively outside the residence or unless the smokers in the home quit. Thus, children living with a smoker who smokes in the home may insure exposure even if the child is not present while smoking takes place.” (Id. at 146.)
“Studies suggest that nicotine can be deposited on surfaces and may be ‘off gassed’ even when no smoking is taking place. This means that nicotine exposure is possible from physical contact with contaminated surfaces or by breathing air from a *314 previously contaminated room. Recent work by Appte, et al, has shown that the indoor behavior of nicotine is so complex that it may not be a good representation of ETS particles. For instance, nicotine is much less mobile than other ETS compounds and is not distributed as much or as quickly into adjacent rooms. Moreover, walls and surfaces soak up (i.e. absorb) nicotine but not particles until the surface is saturated. When nicotine concentration is low, the nicotine absorbed in the wall is slowly released into the air. This means nicotine can be released into the air from smoking that took place much earlier. Thus, researchers may detect nicotine/cotinine in the air, blood or urine even though a person was exposed to other ETS compounds. This is due to nicotine’s tendency to stay within the room in which the smoking took place, whereas other ETS compounds travel to adjacent rooms more freely.
“Early studies suggest that distance from a smoker may protect a child from nicotine but less so from small particles and other toxic agents. Early studies also suggest that nicotine exposure may take place simply by spending time in or by contaminated surfaces of a room where smoking has taken place.
“Infants are more likely to contact surfaces and inject nicotine from hands.
“Older children may be less at risk for hand-to-mouth exposure, but are likely to be exposed to dispersed particles (and related toxins) even if they are always at a distance in their own home from the place of smoking.” (Id. at 150-151.)
(2) James L. Repace, a physicist and senior policy analyst with the United States Environmental Protection Agency and recipient of the United States Attorney General’s Medallion from the United States Public Health Service in 1989 and the Dr. Luther L. Parry award from the United States Public Health Professional Association in 1988, has analyzed the risk management of passive smoking at work and home in an article published in the St. Louis University Public Law Review (13 St. Louis U Pub L Rev 763 [1994]). In this article he computes emissions in various sized residential settings.
Repace notes that there are essentially five management strategies for managing ETS in buildings. First is ventilation *315 and he concludes that in a residential setting, “even if building owners could be persuaded to increase ventilation rates to control smoking * * * more than a thousand-fold increase in ventilation rate is required to attain de minimis risk at typical smoking rates. Such impractical increases in ventilation rate would result in a virtual windstorm indoors.” (Supra at 776.)
The second strategy is air cleaning which is not economically feasible or present before the court.
The third option is smoking sections. Repace opines that “confining smoking to one side of a room does not reduce the ETS loading of the space. Thus, tobacco smoke will rapidly diffuse throughout the space and the laws of physics also rule out this putative control measure.” (Supra at 777-778.) Repace continues “Rmoking in one room will rapidly diffuse into another unless its door is kept closed. It must be kept in mind that an air exchange rate of 1 ACH, it takes more than three hours for 95% of the smoke in the air to dissipate once smoking has ended, and if the door is opened in that time, the remaining smoke will escape to the remainder of the house.” (Id. at 778.)
Strategy four, separating smokers in different rooms in the same building is problematic. According to Repace (at 779) “Reparation of smokers from nonsmokers in physically separate spaces on the same ventilation system assumes — on faith — that the air volume of the building will dilute the risk down to an acceptable level.” Repace notes that in an evaluation that he performed of secondhand smoke in work places from nicotine measurements:
“A method was developed to analyze the levels of the nicotine metabolite, cotinine, in the body fluids of nonsmokers. Based on the data from four thousand persons, the level of cotinine found in the blood and urine of typical nonsmokers indicate second-hand smoke lung cancer risks which are thousands of times the large-population de minimis risk for carcinogenic residues in air, water, or food.” (Supra at 780.)
The fifth strategy is smoking lounges on separate ventilation systems. This does not appear to be applicable in a residential setting. Finally smoke-free buildings. Smoke-free buildings, Repace concludes, “if applied nationally, make good pollution prevention policy.” (Supra at 784.)
“Results of epidemiological studies provide evidence that exposure of children to environmental tobacco smoke is associ *316 ated with increased rates of lower respiratory illness and increased rates of middle ear effusion, asthma, and sudden infant death syndrome. Exposure during childhood to environmental tobacco smoke may also be associated with development of cancer during adulthood.” (American Academy of Pediatrics Policy Statement Environmental Tobacco Smoke, supra.)
The present Environmental Protection Agency Web site sets forth the following steps to reduce exposure:
Do not smoke in your home or permit others to do so.
Do not smoke if children are present, particularly infants and toddlers.
Do not smoke in car. The high concentration of smoke in a small, closed compartment substantially increases the exposure to other passengers.
If you must smoke, choose to smoke outside. Moving to another room or opening a window is not enough to protect your child.
Proposed Holding Based Upon Judicially Noticed Materials
If the court does take judicial notice of these facts and articles, it will hold it is in the best interest of the child that the defendant and the plaintiff should be ordered not to smoke or allow smoking of any type either at home or in the car at any time so that Nicholas may occupy both free of ETS exposure or risks. Nicholas’ exposure to ETS based on his description and his mother’s acknowledged smoking habit is unacceptable in any parental residence or vehicle or other indoor situations. The court will find any avoidable exposure of Nicholas to ETS is unacceptable because said exposure will place him both presently and in the future as an adult at increased risk to develop asthma, reduced lung function, coronary artery disease, lung cancer, and respiratory disorders.
The court will further order to the extent practical that each parent maintain a smoke-free environment for Nicholas at all times in the home and car, and wherever possible and practical, in other circumstances.
Ruling
The parties have 30 days from the date of this decision to object to various scientific facts and articles proposed for judicial notice and the proposed conclusions based thereon. If objections are interposed, a hearing will be held on the matter *317 that is the subject of the objection. If no objections are interposed then the Law Guardian shall prepare and submit a final order consistent with the proposed holding and circulate the same to all counsel for review.

. Public Health Law §§ 1399-n — 1399-x, entitled Regulation of Smoking in Certain Public Places.

. A recent Fourth Department decision, Bluntt v O’Connor (291 AD2d 106 [4th Dept 2002]), touches on this issue in the most tangential manner. The trial court in the underlying case held that the infant child was not exposed to secondhand smoke and that the expert’s testimony had not linked hair and clothing exposure to health risks. The unsuccessful parent in the underlying case then sued the law guardian for malpractice. For several reasons, including acceptance of the trial court’s finding in the underlying case as mentioned above, the Appellate Division dismissed the claim.

. The court notes that a United States District Court in the Middle District of North Carolina has criticized the EPA report and “vacated” the findings. (Flue-Cured, Tobacco Co-op. Stabilization Corp. v U.S.E.P.A., 4 F Supp 2d 435 [1998].) The court has carefully reviewed the decision, and finds that it largely deals with administrative procedure issues and that its criticism does not disprove or dispose of the scientific findings of the EPA report. In any event, this court is not bound to follow the rulings of a United States District Court. (Hartnett v New York City Tr. Auth., 200 AD2d 27 [2d Dept 1994], citing Marsich v Eastman Kodak Co., 244 App Div 295, 296, affd 269 NY 621 [“A Federal decision contrary in principle is not binding upon a State court in respect of a State statute or of a domestic doctrine not involving a Federal question”]; see also Podraza v Carriero, 212 AD2d 331 [4th Dept *311 1995] [which reiterates that state courts are not obligated to follow federal courts in United States constitutional or statutory construction other than the United States Supreme Court, unless there is a consensus position amongst the lower federal courts],) A determination by one District Court Judge, sitting in Winston-Salem, North Carolina, holding that the EPA report is procedurally defective, cannot be considered a “consensus” and cannot bind this court. Although it is suggested in Aviation W. Corp. v Washington State Dept. of Labor & Indus. (138 Wash 2d 413, 980 P2d 701 [1999]) that Flue-Cured Tobacco (supra) was appealed to the Fourth Circuit, under number 6:93CV370, we are unable to find any report of any appellate level decision in Flue-Cured Tobacco.