Matter of J.M.M. v K.K. (2004 NY Slip Op 51784(U))

[*1]

Matter of J.M.M. v K.K.

2004 NY Slip Op 51784(U)

Decided on December 23, 2004

Family Court, Nassau County

Lawrence, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 23, 2004

Family Court, Nassau County
In the matter of a proceeding for custody under Article 6 of the Family Court Act J.M.M., , Petitioner,
against
K.K., Respondent.
V-XXX

Richard S. Lawrence, J.
In this contested custody matter, the parties were on trial before this Court commencing May 3, 2004 and for a period of nine total trial dates. Upon conclusion of this matter, it was sub-mitted to the Court for written decision.
Prior to this matter, there has never been any Court order of custody and/or visitation to either of the parties.
 FATHER'S TESTIMONY
The Petitioner's first witness was Petitioner-Father himself. The Father stated that his relationship with the Mother lasted four and one-half years and they lived together, not being married, from 1996 until approximately April 2000 in an apartment in Oyster Bay, New York. The parties had two children in common, Adam, born
February 5, 1997, now 7 years old and Brian, born October 20, 1998, now six years old. At the time the Father left the Oyster Bay apartment, the children were three and one and one-half years,
and the Father moved to his brother's apartment in Oyster Bay, about five minutes from the Mother. The boys remained with their Mother at the time of the "hard and hostile break up."
For approximately the next six to eight months, the Mother made it "difficult" for the Father to visit. The Father had moved to Island Park in January 2001 at which time the Mother was [*2]living in her parents' Glen Cove apartment with the children. The Father was then seeing the children every other weekend from Friday evening, including overnights, and spoke to them during the week on the telephone. The Father states that the Mother was "somewhat" cooperative with visitation during that time.
However, thereafter the Mother moved four or five times and the Father did not know where the Mother was located and/or had problems with visitation. Accordingly, he filed the instant petition on March 18, 2003 due to the Mother's many moves and the children's behavior.
The Respondent-Mother, after having lived with her own mother in Glen Cove since July 2000, then moved to her grandparents' home
in Glen Head during August 2000. She thereafter moved to Glen Cove with her then boyfriend and now husband, J.A., in late 2000 and thereafter to Mastic with her boyfriend, J.A., in early 2001. At all times the children were with the Mother and while in Mastic, the Father was still able to accomplish his visitation. He trans-ported the children back and forth even though it was one hour from his then home in Island Park and he had the same visitation arrangements as when the Mother was in Glen Cove.
Thereafter and in late 2002 or early 2003, the Mother moved to Riverhead with another boyfriend named D., together with the children, for a period of two months. During their stay in Mastic and then Riverhead, Adam was in kindergarten. The Mother remained in Riverhead for approximately two months and then moved back with the children to her parents' home in Glen Cove in mid-2003, and thereafter to her present residence in Glen Cove.
During an incident in late 2002, the Mother called the Father, stating the children were lighting fires and bedwetting. She told
the Father that she could not handle the children and the Father offered to take them temporarily; however, this made the Mother
upset and she would hang up the phone.
The Father went to a teacher's conference during December 2003. The teacher said that Adam had been fighting in the schoolyard, cursing, that he brought a knife to school, was a bully and his report card showed that he was consistently late to [*3]school, with many tardies. Placed into evidence as Petitioner's I was Adam's report card for the 2003-2004 school year. It shows 6 legal absences and 29 times tardy, with no illegal absences. The comments for the entire school year indicate that Adam is pro-gressing nicely in reading and other areas in first grade, but that he needs to improve his behavior and "listen more during instruc-tion." The teacher's comments in June include "please try to bring Adam to school by 8:45 a.m. He has numerous latenesses." There-after, Petitioner's II was placed into evidence, which is Adam's report card for the school year 2002 - 2003. It indicates 8 days absent and 23 unexcused tardinesses.
The Father states that he has also filed his petition due to what he terms Adam's behavior, starting in 2003, "putting his hands
on his brother, leaving marks on his brother, abusing his brother, acting up a lot," and the alleged fact that it is hard for the
Father to discipline Adam because the Mother does not discipline him at all and he has "no structure." The Father states that the Mother told him that she has asked him for help with Adam because she "can't handle him." The Father's method is to sit down with Adam and to talk to him about these incidents. The Father further states that Adam lies to everybody including himself (the Father).
The Father states that Brian has started to "pickup" Adam's bad habits, cursing, lying and ignoring you when you speak. The Father states that during March 12, 2003, the Mother's boyfriend, D. said that he wanted the children out of his home, that the Mother was taking drugs, diet pills and alcohol, and he (D.) could not take it anymore. The Father then immediately called the Mother and said he would take the children for the evening. The Mother left D.'s home that day. The Mother told the Father that she can drink if she wants to, denied any drug use and stated that D. was abusing her in front of the children; the Father became very upset at this.
At the Father's home at the current time is his wife, his new six week old baby girl and his mother-in-law. He was married to his wife K. on April 26, 2003. He has six rooms in his home,
[*4]
including three bedrooms. Adam and Brian share a room with bunk beds, the Father and his wife have their own bedroom and his mother-in-law has her own bedroom in this one story house. The Father's school district is Island Park and the elementary school which the children would be attending, should the Father obtain custody, is two blocks away. The Father would either drop the children off to school or walk them to school. The school day is 8:40 a.m. to 3:20 p.m., and after school activities last until 6:00 p.m. These activities are optional at the parent's request.
The Father is adding an additional floor to the top of his home to include three additional bedrooms and one additional bathroom. This way, Adam, Brian and the baby will all have their own bedrooms. The Father is a licensed plumber and is self-employed in his own business. He works out of his home. His schedule is 9:00 a.m. to 5:00 p.m. Monday through Friday. He also has employees who can handle emergencies and his job sites are only
in Nassau County. The Father states that due to his work schedule, he could "drop everything" and immediately go to the children's school should an emergency arise; he also states that he could send someone else to school in the event of an emergency.
The Mother smokes in her house in front of the children; the children smell from cigarettes and they have coughs and chest congestion. The Father further states that "there is a convicted criminal" named M. who lives at the Mother's home. The Father met M. one day when he was dropping the children off during visitation and he discovered that M. babysits the children. The Father states that he discussed M. with the Mother; the Mother stated that M. "is a nice guy" and there are no problems with him whatsoever. The Father further alleges that the Mother speaks to the children "like adults" and allows them to watch R rated movies because, she says, "they like it."
In December 2000, the Father was arrested for DUI and the disposition was a guilty plea to speeding. The Father attributes this to "going through a hard time" when he was not allowed to see Brian on the child's birthday, and that such a thing "will never happen again." The Father states that he now drinks "very rarely."
In summation, the Father states that he can provide more stability, more discipline, and a better family structure for the boys, while the Mother can provide none of this. He has no [*5]desire to "shut" the Mother out of the children's lives.
On cross-examination by the Mother's attorney, the Father states that the last time he saw the Mother "she had a cigarette dangling from her mouth." She has never let him into her house and he never physically saw M. actually babysitting the kids. Each time the Father went to the Mother's home, either she or her parents were supervising the children. The Father telephones the children three times a week; either he calls them or they call him.
The Father has the children from Friday evening until Sunday, every other weekend; he does not know how the Mother disciplines the children; and during telephone conversations, the Mother starts to scream at him and hangs up on him. The Father states "she
doesn't talk to me." The Father has, on occasion, attempted to see the children during the week, and the Mother has allowed him to do this.
On cross-examination by the Law Guardian, the Father stated that he left the Mother during April 2000 because she was cheating
on him with her boyfriend, J., who is her present husband. The Father states that the Mother was angry with him for leaving and as a result, refused to let him see the children; she made it "very stressful" for him. Since then he has had "consistent" telephone
contact with the children, meaning that he can speak to them, but the conversations are often cut short.
Since there never was any prior order of custody and visita-tion, the every other weekend visitation arrangement was by agree-ment between the parties; the Father feels that there would have been problems if he had requested additional visitation. The Father also had the children for two weeks during the summer of 2003, and also Christmas Eve.
The Father states that the Mother will not let him have the children for holidays and that she still is "very angry" at him. The Father mentioned the need for a therapist for the children, to the Mother, but the Mother was not interested. Adam has been seen by a guidance counselor only commencing several weeks ago.
[*6]
Regarding his many latenesses to school (Petitioner's I in evidence), Adam told the Father that this was because the Mother
slept late. The Mother refused to discuss this with the Father. However, the Father states that the Mother told him that the problem is with the children, and that Adam also oversleeps. The Father states that Adam lies and is "always trying to hide some-thing;" in this the Father states that the Mother agrees that this is what Adam does.
Regarding the Mother's boyfriend D.'s abuse of the Mother, the Father states that the Mother told him that D. was hitting her, pulling her hair and locked the children in a closet during the abuse.
During this cross-examination, the Father gave a different reason for his DUI arrest. He states that it was at a Christmas party when he was depressed, and not because he was not seeing his sons.
The Father states that he can give "greater stability" to the children, as he has been in the same home since January 2001; he is building a bigger home and will remain there; the neighborhood is "great"; there is little crime, and the Father can give the children more discipline. The boys have no respect at all for their Mother, and they curse at her. In contrast, they respect the
Father and "act fine" with the Father. The children never curse when they are with the Father. When the parties lived together, the Mother always smoked.
On Petitioner's re-direct, he states that the Mother never told him that Brian had been seeing the school psychologist. When he found out (at trial), he spoke to the school social worker, who
is the one actually involved in seeing Brian. He states that Adam had been seen by her only "two and one-half" times and he is "craving for attention." Adam also visits the school nurse a lot, almost every other day, and talks to her for "very minor things." Petitioner's exhibit III in evidence is Adam's and Brian's incident reports from the Glen Cove School District, indicating their visits to the school nurse from October 24, 2003 to May 11, 2004.
Regarding support, the Father states that he paid child [*7]support after the parties separated in no set amount, but "it was never enough." He never lapsed in his payments and after a support order was rendered, he was always current. When the Mother was living in Glen Cove at her mother's home, the Mother told the Father she had been "kicked out" of that home.
 PROBATION OFFICER'S TESTIMONY
The Father's next witness was Kathryn Policastro, Nassau County Senior Probation Officer. She is the person who prepared the probation report which has been entered into evidence as
Petitioner's Exhibit IV. Two home studies were made, together with investigations of the parties and the Father's current wife; the recommendation is custody of both boys to the Father.
One of the reasons for this recommendation is that when the Mother was tested by TASC by Court order, she was positive for marijuana at a time when she was pregnant. The children were "precarious with the Mother's boyfriend, D., in Riverhead;" she did not find the Mother credible; the Mother did not give information to the investigator; and she was not forthcoming and lied to the investigator as to who stays in her second bedroom. The children, who were present, did not dispute this.
The local fingerprint check indicates five arrests of M., the Mother's tenant in the second bedroom, including a conviction of DUI in 1995; a conviction in 1999 for attempted burglary in the second degree, a D felony which he was sentenced to 21 days plus five years probation; and what appears to be a violation of probation.
Petitioner's Exhibit IV in evidence reviews the Mother's many moves throughout Nassau and Suffolk counties and her series of boyfriends. The report states that the Mother stated to the
investigator that she and D. became romantically involved when they were living in Riverhead together. (Page 5 of the probation report refers to D. as the Mother's "paramour.") She stated that she had called the Father several times for help and he refused.
Regarding the home study at the Mother's home, she was "less than truthful when naming the occupant of her living quarters." [*8]In particular, she "falsely reported to us [Probation] that a second bedroom in the basement was one where her stepson sleeps when he comes to visit her." Probation subsequently found out that this is the sleeping area of M. During this home visit, the investigator notes that the children had "little regard when their mother attempted to correct their behavior."
The report continues on page 2 that the Mother "acknowledges that she utilized poor judgement when she exposed her children to a dysfunctional lifestyle during the prior year and expressed
remorse over it." She states that there are no rules at the Father's house, but "acknowledges that J.M.M. is a good father and loves their children, but believes his petition is driven by financial needs."
In the probation report, the Father reports to probation the reasons that led to his filing the current petition, which are the
same as those to which he testified. The home study of the Father indicates that the "home is safe, clean and appropriate, with a room large enough and appropriately furnished for the boys."
On pages 3 - 4, the report continues that the Father is very concerned regarding the Mother's lifestyle, her many relocations, the fact that Adam has had to change schools four times in his very short school career, that the Mother is "verbally inappropriate" around the boys and is not attentive to their needs, especially their educational needs. He is "fearful" of what the future may hold for the children "due to their mother's unstable history."
According to the report, Adam apparently has vivid memories regarding their time in Riverhead with D. D. was mean to Adam,
locked him in his room, grabbed the Mother's neck and made him and his brother scared. The children love both parents as well as their step-parents.
The investigator appeared satisfied with the respective step-parents.
The probation report concludes that the Father is appropriate and concerned for the children's safety; his home environment is
[*9]
"stable and safe" and that the Mother's "deliberate omissions were disconcerting and cause us to have additional concerns over the possibility of other half truths" that the Mother may have made to the investigator.
The report continues in its conclusion that the Mother has "made many inappropriate decisions regarding the welfare of her children including four relocations over the last calendar year and subjecting them to a physically abusive relationship" with D. "She appears to have continuously put her own needs first whether a relocation, a new romantic relationship and more recently smoking marijuana while pregnant." The investigator is also concerned about the Mother's "unsuitable parenting skills" which were wit-nessed firsthand by the investigator.
The Father's wife, K.M., "is fully supportive of her hus-band's efforts to gain custody of his sons. She impressed as an involved stepparent. She was opposite in every way from the Respondent [Mother]." Probation is concerned with the Mother's "poor judgment," and therefore recommends that custody of Adam and Brian be placed with their Father.
During cross-examination of Ms. Policastro by the Mother's attorney, she stated that the Father's house was "lovely" and being expanded and that his wife is pregnant. In addition, the Mother's
home is "fine." The Mother moved around a lot because she was "with different men." The children were "out of control" at the Mother's home at the time the Probation Officer visited, the Mother was "frazzled" and the children would not listen to her. The investi-gator was concerned with the Mother's lack of honesty and she had a "hard time" answering questions. For example, she kept giving different dates of birth for her husband, and explained to the investigator that she had moved a lot due to the various men in her life.
The investigator finds the Father and his wife "more stable." The investigator was impressed that the Father's wife reads to the
children, pays considerable attention to them, and is a literacy volunteer.
The Mother has not been forthcoming as to who she was living with. She stated that her stepson was the one who used the base-ment bedroom, while in effect, it was M. The fact that the Mother was smoking marijuana while she was pregnant causes considerable
concern to Probation. Also of concern is that initially, the Mother did not mention M. at all to the Probation Officer.
Although the Mother stays at home with the children while the Father works, the Father's wife stays home with the children, as well.
During the Law Guardian's cross-examination, Ms. Policastro stated that the Father's wife is "very appropriate" and "verbalized in a wonderful way with me." She stated that the Mother had told her that when she "did pot" while she was pregnant, that her current husband also "did pot" at the same time, and that she told the investigator that she "occasionally did pot" with her husband. She alleged to the investigator that she learned she was pregnant only after she "did pot."
The Mother committed "an error in judgment" when she moved to Riverhead with D. and the Mother sought the Father's help when she was abused and threatened by D. The Riverhead situation was "dangerous" and "scary."
M.'s arrests consisted of a DWI, September 2, 1995; a C Felony burglary, July 10, 1998; a C Felony burglary, August 8, 1998; an E Felony, grand larceny, September 26, 1998; and an E Felony, grand larceny, September 30, 1998.
According to the Mother, the children sometimes are left alone with M., and the Mother confirmed this to Probation.
 MOTHER'S TESTIMONY
The first witness to testify for the Respondent was the Respondent herself, now known as K.A. She was born on October 19, 1970, graduated Glen Cove High School and was a licensed hair dresser, having been employed until Adam was born; since that date she has been an "at home Mom." The parties moved in together about six months prior to Adam's birth, where they lived in Glen Cove. When Brian was born approximately one and one-half years later, they were living in Oyster Bay and the parties were still together. The Father left the Mother when Brian was two years old in 2001. The Father gave child support to the Mother, [*10]apparently willingly
and without any problem. Thereafter, the Mother left the Oyster Bay apartment and moved in with her parents in Glen Cove for about a month and thereafter moved in with her grandmother in Glen Head because there was more space. However, that lasted for only two weeks; the Mother stated that the grandmother was then ninety years old and that having this family with her was "too much" for her. The Mother then moved back to her parents' home in Glen Cove for an additional two months, at which time she met J.A. (Mr. A.) and moved in with him in a Glen Cove apartment for approximately one year. Thereafter, he bought a home in Mastic when the boys were ages four and five. Adam was enrolled in kindergarten and Mr. A. and the Mother lived in that home in Mastic for one year. The Mother then had a "falling out" with Mr. A. and moved in with "mutual friends" in Riverhead for one and one-half months. Thereafter, she and the boys moved back to her parents' home in Glen Cove for about a month; and then she and the boys moved back in with Mr. A. to a home in Glen Cove. A new baby was born to the Mother and Mr. A. on December 29, 2003, and she and Mr. A. are now husband and wife. They have a downstairs tenant named M.
 Although the Mother has not been employed since the boys were born, her parents have helped her out financially with household
bills and with the children's needs, such as clothing and camp, as well as the Mother's rent after the Father, J.M.M., left.
She states that her move to Riverhead was "a big mistake" and that she wanted to leave there "as soon as possible." She called the Father, J.M.M., hysterically, stating she wanted to leave, but she wanted the Father to take the children. She states that the Father refused, saying he needed to work and could not help her. She made three of these pleading phone calls to the Father.
During this time, the parties had agreed to visitation, approximately every other weekend, although the Mother states it was "sporadic" especially when she moved to Mastic and Riverhead. [*11]In addition, the Father had a very variable work schedule which did not necessarily allow for specific constant visitation times and days.
The Mother admits to having tried cocaine in high school where she graduated in 1988, but has not used it within the last ten years. She had used diet pills and was addicted to them when she was living with the Father when she was over 250 pounds. She there-
after stopped using them several years ago. She states she is a
social drinker only, and only at parties. Regarding marijuana, she states that the last time she used it was at a party during the summer of 2003 and the last time prior to that was approximately five years ago.
The Mother continues that before this case was started, the Father rarely attended school conferences, but that subsequent to the filing he has attended almost every conference.
Introduced into evidence as Respondent's Exhibit A are Adam's school attendance records from September 2003 through June 2004. They show four latenesses for December, twelve for January, five for February, and seven for March through June. Brian's records, also part of Respondent's Exhibit A in evidence, show approximately the same number of latenesses.
The Mother attributes this to the fact that when her new baby, Nathan, was born in late December 2003, that her husband was in
charge, and he "didn't know what he was doing." He would be responsible for getting the children off to school, but he would get them there late because he was not aware of the check-in pro-
cedure at school.
The parties "don't talk" at all; there is very little inter-
action between them.
The Mother admits that she is a smoker, but does not smoke inside her house.
Both boys are involved in a series of extra curricular sports activities at a local stadium in Glen Cove. The Mother transports them and the Father has gone to see their games this past summer, but did not do so "prior to Court."
[*12]
Regarding the tenant, the Mother states that M. has been there several months. He is a friend of both the Mother and her husband and they have known him one and one-half years. She admits that she did not tell the Probation Officer about M. initially, and gave a series of excuses for this. Later, when the Probation Officer called her and asked where M. was, the Mother admitted he lived there. Thereafter, M. was fingerprinted at the Mother's request for Probation's purposes. The Mother's husband has a son, also named J.A., who lives with his mother in Hicksville. That son stays with his Father every other weekend.
Regarding M., the Mother insists "there is nothing wrong with him."
On cross-examination, the Mother stated that she moved a lot because the Father did not support her and the children. However, she thereafter testified that the Father had been making support
payments ever since the parties' separation and nevertheless the Mother still moved to Mastic, Riverhead and Glen Cove while such payments were being received.
 She lived in Riverhead for two months only, where Adam was in school. Her landlord and the "mutual friend" in Riverhead named D., was "not her boyfriend." However, she admitted that she slept in the same bed as D.
Although the Mother told the Probation Officer she had been addicted to diet pills, she now denies she was ever addicted.
Regarding the school latenesses which she blames on her husband, the Mother states that her husband simply did not know what he was doing. However, the Mother then started to take the
children to school and there were still eight additional late-
nesses. Furthermore, as shown in Petitioner's Exhibit 2 in evi-dence, which is Adam's school report when he was in kindergarten,
this was admittedly prior to the baby being born and yet Adam had
twenty three latenesses and eight unexcused absences. The Mother admits that her husband was not to blame for this.
Regarding her cigarette smoking habit, the Mother admits that she smoked cigarettes while she was pregnant with her new baby Nathan and has smoked cigarettes in the car while driving [*13]and with the children present.
The Mother further admitted that when she signed Adam up for camp this past summer, and Brian for school this past summer, she did not consult the Father, despite their visitation agreement, as "I didn't know I had to."
The Mother admits that the boys "love their Father so much" and that "it would destroy them" not to visit with him.
The Mother states that although she really wants to speak to the Father regarding the children, the Father absolutely refuses to speak to her.
Regarding the marijuana at the party which the Mother admits she smoked, she states that her boyfriend, and now husband, also smoked it at that same party.
On cross-examination by the Law Guardian, the Mother testified that she had left D. because he had pulled her hair at which time she told the children to call the Father and told them that "we have to leave now." She stated that D. was irrate that she wanted to leave and go to live with her Mother. She continued that D. had said he would tell the Father that she was using drugs and alcohol in order to get the Father upset; and in fact, he called the Father while the Mother was present. At that time, she stated that she then called the Father crying asking him to please take the children; that the Father said he could not and that she then called her mother who told her to leave immediately and leave all of their possessions in Riverhead, which is what she did.
The Law Guardian then brought out from the Mother that the Father had told her that he "wanted to keep" the boys, and not just for a few days as the Mother had requested; and that the Father had been "threatening" to take the boys just prior to his filing of the instant petition. She continued that although the children did not
witness the hair pulling by D., they did witness his argument with her and her crying.
Regarding her use of cocaine, she stated it was "only one time in high school" and that "I wouldn't call it 'use'." She [*14]then testified (contrary to her direct testimony) that her husband did not use marijuana at the party.
Regarding the many latenesses to school, she admitted that her husband had made the children late even though she herself was home, and that what he should have done, if the children were "just a little late," is sign them in on a particular sheet at school, so that it would not be counted as a tardiness; however, this he did not do. The Mother also admitted that she herself was not always so prompt in getting the children to school. She then gave a further excuse, that after the baby was born, things were "hectic," and she did not "coordinate" with her husband.
Regarding her cigarette habit, she smokes approximately one pack a day, but smokes outside and not in the house, and when the children are not "standing by her." She further admitted that "once in awhile" she smokes in the car, but "with [her] hand out" and that she "doesn't like to smoke in the car with the baby." She
stated that her husband smokes five or six cigarettes per day.
Regarding M., he does in fact live in the basement, and is a friend of her husband. He spends time with the entire family, and "once in a blue moon" he stays alone with the children. The Mother continued that she knows of M.'s arrests and convictions as testified to by the Probation Officer and she has known this for "a few years." However, M. only told her about a DUI for which he stated to her he was sentenced to five years probation and she thinks he pled guilty to the charge.
 She is not at all concerned with having M. in the presence of the children, as we "already know him;" he has served his five years probation, and "the kids, my husband and I love him;" he is "a big part of the kids' lives and M. loves them." She concluded that M. is "a wonderful guy." She stated that M. will be moving to his mother's home in a few months and that his occupation is taking care of cerebral palsy patients as an aide. She states that he does not pay rent for his tenancy, but that he "helps out."
As to why she did not tell the Probation Officer of M.'s presence in the home, she stated that there was "no reason" that she did not reveal this information, and that "I wasn't thinking." Her stepson does in fact spend every other weekend with her and her
husband, so that she was not lying to the Probation Officer [in part]. Upon questioning by the Court, the Mother testified that she smoked throughout all of her pregnancies and quit only for one month after Adam was born. At the time she testified positive for marijuana on May 20, 2004, she was two months pregnant with Nathan and it did not concern her because she did not know she was pregnant and she "didn't think [she] could get pregnant." Nathan was a full-term delivery.
Upon re-direct examination, the Mother admitted that some of her moves were for financial reasons, but some were not. She stated that she had made "tons" of calls to the Father when she was living in Mastic, for his help and he always refused unless he was able to have the boys full-time with him.
She further testified that she "never" denied the Father any holiday visits he asked for, and that in fact he had the children for two weeks during the end of August 2004, and she readily agreed to let the Father take the children to Dorney Park.
Regarding the marijuana incident at the party, the Mother stated that she had taken it "more towards April" when she did not know she was pregnant, and she did not find out she was pregnant
until June, 2004. On re-cross examination by the Father's attorney, the Mother hedged considerably as to the boys' latenesses during the last marking period, and her testimony was different from that which was given on direct.
When questioned again about her husband's smoking marijuana, she again changed her story by saying that he did in fact "do pot" at the party; and then she again changed her testimony by saying he did not.
Regarding her testimony that the children never saw D. physically abuse her, even though the Probation report says they did, her response was "they're [the boys] not liars." Regarding Adam's 23 latenesses (Petitioner's Exhibit II in evidence) the Mother stated these were all because Adam did not want to go to school. Finally, she testified that the reason she had left her Mother's home and moved to Riverhead was that she did not want to burden her Mother because her Father had just had a heart attack. (The Court notes that this is the first time that she gave this as an excuse.)
 TESTIMONY OF MICHAEL DeMOTT
 The Respondent's next witness was M. He is 33 years old, lives as a tenant with the Mother and her family in a two story home, sleeps in the basement and has known J.A. ten years and the Mother two years. He testified that his Father was President of the Bank of New York; but, then after several additional questions, admitted that his Father was merely a branch manager. He admitted to a driver's license suspension in 1996; two arrests for DUI; two felony burglary arrests in which he pled guilty to a "low" felony and was given five years probation which was due to be completed July 13, 2005, but which was shortened by 1 year for "good behavior", and for which he was also sentenced to twenty days in jail. He was seeing a therapist in accordance with a Court order on that criminal matter and is now seeing the therapist voluntarily due to depression.
He is employed at United Cerebral Palsy in Bayville as a trainer where he helps patients and he also has a second employment "helping a family." He plans to move to Florida during December 2004 to be with his parents and to go back to school.
He is close with the Mother and her family and he babysits for the children. Last month he babysat twice for approximately 1 - 2 hours each.
He testified that the Mother smokes outside in the yard and the husband smokes "but not in the house." He continued that the
Mother is "very good with making sure they [the children] do their homework," and that the Father comes to most of the children's soccer games.
On cross-examination by the Father's attorney, M. testified he knows J. A. seven years and that the husband smokes "maybe a pack a day" of cigarettes. M. himself smokes, but not in the house, although every day, but does not smoke in the car with the children. He stated that he has been at parties a few times with the Mother and her husband and that no drugs were used by anybody at any of those parties.
Contrary to the testimony by the Mother, M., the Mother's own witness, testifying regarding communication between the parties, stated that "they usually talk to each other." He has [*15]in fact heard the Mother speak to the Father on the telephone, although he does not know who calls whom. On cross-examination by the Law
Guardian, M. admitted to five total arrests although he stated he really does not know how many total times he has been arrested.
Regarding additional questioning by the Law Guardian, M. attempted to minimalize all of his criminal involvement, and
hedged his answers. He further stated that he was not "familiar" with the "Court system" [even though he obviously had been through the "system" approximately half a dozen times].
Contrary to the Mother's testimony, M. then stated he pays "a little rent" monthly to J. A., depending upon what he can afford. Upon further questioning, he stated that this amount is "negligible" although about four hundred dollars per month.
 TESTIMONY OF MATERNAL GRANDMOTHER
The Mother's next witness was her Mother, L.K. She testified that she and her daughter have an "excellent relationship" and that they are "extremely close." She speaks to her daughter every day and sees her between four - five times a week. They live approxi-mately a mile from each other and five minutes by car. She first met the Father, J.M.M., approximately 1998, but sees him only
occasionally and only when he is picking up her grandsons for visitation. She describes the Mother's health as "fine," that the Mother does not drink, but that when she was a teenager she knows the Mother tried cocaine.
Regarding the Mother's testing positive in Court for mari-juana, this witness did not know of any such marijuana use until it was revealed in Court during these proceedings. The witness stated that she would be surprised if the Mother had kept anything from her.
Both this witness and her husband have helped the Mother out financially including paying her rent and all of the bills, after the parties to this action separated and the Mother left Oyster Bay.
She continued that the Mother has no problem taking care of [*16]the children. Regarding diet pills, the Mother took them several years ago, she thinks by prescription, and then the Mother stopped "cold turkey" even though she was still overweight.
When the Mother moved to Riverhead with D. for approximately one month, this witness never visited her. She stated that D. was an "extremely controlling individual" who was "not good" for either
the Mother or the children. She further stated that "D. was not a boyfriend" of the Mother and that D. had worked with J.A. as a painter. One day the Mother called from Riverhead telling this witness that she was very upset. The witness's husband picked up the Mother and the children and they all moved in with them in Glen Cove.
She continued that the Mother has been a full time Mother since the boys' births and in that capacity she is "wonderful" and "terrific." She plays sports with them, goes in the pool with them
and bike riding. The Mother sees to it that the children are "happy and occupied" and this has been considerably before any Court proceedings. She states that sometimes the Mother takes the children to school and sometimes J.A. does.
On cross-examination, the witness again admitted that the first time she heard of the Mother's marijuana use was after a Court proceeding and that the Mother had not told her earlier about
this. Although the witness did not know the sleeping arrangements in Riverhead with the Mother and D., the witness would be "sur-prised" if the Mother slept in the same bed as D., as the Mother tells the witness everything.
On cross-examination by the Law Guardian, the witness testified that the Mother had taken diet pills only after Brian was born.
Regarding the incident with D., the witness testified that he had pulled the Mother's hair, but she knows of no other physical problems between the Mother and D.
 TESTIMONY OF MATERNAL GRANDFATHER
[*17]
The last witness was the Mother's father, J.K. His brief testimony added nothing of substance which would aid this Court, either way, in determining the issues before it. Although this witness was credible, he was somewhat flippant in his responses.
 LAW GUARDIAN
At the Court's request, the Law Guardian has submitted his affirmation in which he reviews salient points of the witness' testimony and in which he recommends custody to the Father, in the best interests of the children, together with liberal visitation to the Mother.
 DISCUSSION AND ANALYSIS
Both the Law Guardian and the Probation Department have recom-mended custody to the Father. However, the Court need not follow the recommendation of any expert nor the Law Guardian nor the Pro-bation Department, if the Court rationally explains the reasons to award custody to the other party. Sienkwicz v Sienkwicz, Nass. Cty Fam. Ct, dec. 12/23/01, Lawrence, J., affirmed 298 AD2d 396 (2d Dept 2002), leave to appeal den'd 99 NY2d 503 (2002). Nevertheless, for the reasons set forth below, this Court does in fact award custody to the Father.
One of the most difficult types of cases for a Judge to decide is that regarding custody of children since it affects not only the parents, but is a determinative factor in a child's growth and a grave responsibility for the Court. In virtually all of these custody cases, the issue of credibility is determinative and the Court must weigh the credibility of each of the parents as an important factor, in effect, to determine custody. Nevertheless, in this particular matter, the question of credibility has been an extremely easy one for the Court. The Court finds that the Father
has at all times testified extremely credibly, whereas the Mother's testimony has been riddled with inconsistencies, non-truths, half-truths, hedging her answers, and what amounts to a denial of her many problems.
For instance, the Father stated that the Mother, who admittedly is a heavy smoker, as is her current husband, smokes in front of the children who cough and have chest congestion. [*18]The Father has also testified that the Mother allows the children to watch R-rated movies and that she allows them to do it because "they like it"(according to the Mother). The Father further testi-
fied that he had been denied visitation because he had left the Mother when she was cheating on him. He wanted the children to have therapy, but the Mother forbid it.
The probation report (Presentment Agency's IV in evidence) states that the Mother was romantically involved with D. when she resided in Riverhead with him. The Mother, in her testimony, denies that D. was her "boyfriend" and that he was simply a family friend. However, she admitted on cross-examination to sleeping in the same bed as D. The probation report continues that one of the boys stated that D. had grabbed the Mother by her neck during one
of the times D. had abused the Mother. Both the Father and the probation report mention D. hitting the Mother, pulling her hair, locking the children in a closet, and sometimes having the children present when the abuse occurred.
Despite the Mother's denials, this Court does not find her credible regarding her relationship with D. In the usual land-lord/tenant relationship, which is what the Mother stated existed, the landlord does not assault the tenant, does not lock the children in a closet and does not sleep in the same bed with the tenant. This Court finds that there was something more and although D. may not have been a "boyfriend" according to the Mother's definition, they certainly had a sexual relationship.
This Court finds that the domestic violence perpetrated upon the Mother by D. was ongoing and probably lasted most of the short
time she was in Riverhead. At least some of this domestic violence took place in the presence of the children and yet the Mother did not attempt to extricate herself from her situation and relationship with D., until the date when she and the children finally left. The Court finds that exposure of the children to continuing domestic violence was, and remains, detrimental to them.
The Court also finds the Mother not credible regarding her [*19]initial denial about any tenant living in her home. Both she, and the boys by their silence, stated to Probation that her stepson sleeps in the basement every other weekend when he visits. It was only when Probation specifically confronted her with M.'s name, that she admitted that in fact he was her tenant. This Court finds that the Mother's judgment is clouded at best, and blind at worst when she states that M. is "a wonderful guy." He has an extensive felony criminal record, which both she and M. minimize. This Court shares Probation's query as to what other information the Mother has been withholding from Probation.
According to Probation, the Mother made her many moves due to her various boyfriends, and not due to her alleged lack of support from the Father. In this, the Mother's testimony also is not con-
sistent: initially she attributed her moves to lack of financial support from the Father, but on cross-examination and on re-direct,
admitted that this played little or no part in her various moves to her various locations in Nassau and Suffolk counties.
Regarding the Mother's admission, only after TASC testing, that she had smoked marijuana only once in five years, the Court
does not find that credible. The chances of a person not having taken an illegal substance for five years and suddenly taking it at the very time the Court orders drug testing, are infinitesimal. The Mother admits to using cocaine in high school. The probation report mentions that her use of drugs is "recreational." It is this Court's considered opinion that the Mother still does not accept full responsibility for her drug use. To use the cliche that illegal drug use is "recreational" is simply to use a well-worn excuse commonly used by drug abusers in order to attempt to somehow excuse or minimize their drug use. In this Court's opinion there is no such thing as "recreational" illegal drug use and if this is what the Mother believes, she is sadly mistaken.
Regarding the Mother's admitted use of marijuana at a party prior to the time she tested positive in court, her testimony was inconsistent. Initially she testified that her current husband was
not using at the same time; later in her testimony she stated he was; and again later in her testimony she stated he was not. Furthermore, the probation investigator testified that the Mother admitted that she and her husband "occasionally did pot." This Court finds that the Mother and her husband likewise have been
smoking marijuana, and on more than one occasion.
One matter of extreme concern to this Court is the Mother's testimony that at the time she was pregnant with Nathan she left it to her husband to bring the boys to school on time. Due to the extreme number of latenesses, which the Mother blames totally on her husband, and her testimony that her husband simply did not know how to have the children arrive at school and check in as they are required to do, this would tend to show that her husband either is totally incompetent or simply does not care. All the Mother had to do was tell her husband what she told this Court if a child is five minutes late and how to sign in at school so that an absence is not counted against the child; apparently the Mother never did this. This Court is therefore concerned that if the boys were left in the Mother's husband's care, that the husband would continue to be incompetent in his raising or taking care of the children.
On her direct testimony, the Mother admitted that she smokes cigarettes in the car with the children present and had done so
when she was pregnant with Nathan. However, she later testified that she only smoked outside of the house and outside of the car, with her hand holding the cigarette outside of the window. This Court does not find that later testimony credible.
The Father testified that the Mother smokes in the children's presence, that the children constantly smell from cigarette smoke and that they are prone to coughs and chest congestion. The Court finds this testimony credible, and further finds that either the Mother's smoking comes first to her over her children's welfare, or she seemingly does not care.
One of the issues this Court must resolve in any custody proceeding is whether the custodial parent will allow the non-custodial parent visitation and keep the non-custodial parent fully advised as to the children's school work and activities. Although this Court finds, to the Mother's credit, that visitation generally has not been a problem, the fact that she did not advise the Father when she signed the children for camp and school during the summer of 2004, and that she did not advise the Father when Joseph started to see the school social worker, causes this Court great concern in that the Mother may continue not to keep the Father fully advised as to the children's well-being, activities and school work.
[*20]
On the Mother's direct testimony she stated that when she telephoned the Father from Riverhead, in her attempt to escape D., she stated the Father refused to take the boys. However, on
cross-examination, and again on re-direct, she admitted that the Father wanted full custody of the boys, and not just temporary custody. This testimony, which was extremely important, again shows that the Mother was not credible.
In sum, the Court finds that the Mother has put her own needs and pleasures above those of her children. This includes her many relocations to different school districts in Nassau and Suffolk counties, her various romantic involvements, her minimizing of drug and cigarette use, and her use of marijuana while pregnant with Nathan.
The probation report (at page 6) states Probation's concern as to the Mother's "unsuitable parenting skills wherein she spoke (in front of the boys) concerning a negative incident with J.M.M. We cannot help but be concerned with her poor judgment."
One of the conclusions in the probation report is that the stepmother is "opposite in every way" from the Mother, all in the stepmother's favor.
Regarding the testimony of M., the best that this Court can state is that he was totally and absolutely and without doubt not credible. At the beginning of his testimony he stated, under oath,
that his father was the "President of the Bank of New York." It was only upon further questioning that he admitted that his father was in fact simply a branch manager.
Regarding non-payment of rent, the Mother stated that M. paid no rent; M. himself initially testified that any payment was "negligible," but on cross-examination admitted that he pays rent in the approximate amount of $400.00 per month.
Regarding his extensive criminal record and criminal behavior, he minimized this, almost to the point as if it were of no con-
sequence.
 APPLICABLE LAW
It is well-settled law in this state that, in an award of [*21]custody, the Court must determine what is in the children's best interests, from a totality of the circumstances; there is no one factor, in most cases, which is determinative in making such an award. Eschbach v Eschbach, 56 NY2d 167 (1982); Keating v Keating, 147 AD2d 675 (2d Dept 1989); appeal dismissed, 74 NY2d 791 (1989)
Among the factors which the Court must consider are the quality of the home environment and the parental guidance that the
custodial parent provides for the child. Eschbach v Eschbach, supra; Matter of Ebert v Ebert, 38 NY2d 700 (1976). This Court finds that the Father has added an entire second story to his home
in order to accommodate the boys in separate bedrooms, should he obtain custody.
Regarding parental guidance, this Court must take into account the current spouses of each of the parties. Regarding the Mother's husband, the Court has stated earlier that, according to the Mother's testimony, the husband is probably incompetent and cannot even structure his day so that the children arrive at school on time. Regarding the Father's wife, the probation report states, in effect, that she is a wonderful person, a nurturing and loving individual, a literacy volunteer and she is an excellent step-
mother.
Likewise to be considered is the ability of each parent to provide for the children's emotional and intellectual development. Porges v Porges, 63 AD2d 712 (2d Dept 1978); appeal denied, 45 NY2d 710 (1978). With respect to this element, again the Father has apparently done everything he can to help the boys with respect to their schooling and many relocations, all in difficult circum-
stances for the Father, in a situation where the parents do not speak to each other. Again, in this Court's opinion, the children's emotional needs would be best served with custody to the
Father and the children's intellectual development certainly will be heightened by the stepmother's involvement.
[*22]
Another consideration is the relative fitness of each of the parents and the length of time that the current custody arrangement
has been in effect. Matter of Nehra v Uhlar, 43 NY2d 242 (1997). "That a change in custody may prove temporarily disruptive to the children is not determinative, for all changes in custody are dis-ruptive." Matter of Nehra v Uhlar, ibid at 248.
The Mother has had custody of the children since their birth and although the parents now do not speak to each other, the Father has done his best to parent the children in very difficult circum-
stances. As set forth above, the relative fitness of each of the
parents is disparate. Clearly, the Father in this Court's opinion is extremely well fit, whereas the Mother clearly is not.
The children apparently are often out of control in the Mother's custody and she does not or cannot properly discipline them, and the Mother's husband is of no help whatsoever. This
should be contrasted with the Father and his wife, who supply the necessary discipline, structure and support.
Another consideration for the Court is the parents' financial status and the ability of each to provide for the children. Eschbach v Eschbach, supra. There was no testimony as to the financial status of either parents nor their spouses. However, it was the Court's distinct impression that the Father, who is a self-employed plumber, and is able to erect a second story to his home, is financially stable. The Court has no information whatsoever regarding the Mother's financial status.
A further consideration is the effect that an award of custody to one parent might have on the children's relationship with the other parent. Bliss ex rel Ach, 56 NY2d 995 (198295); Young v Young, 212 AD2d 114 (2d Dept 1995).
Although generally the Father has had visitation, although perhaps not as extensive as he would have wished, the Court finds that the Mother did not unduly withhold visitation from him. However, the Mother's testimony that she failed to advise the Father of the children's camp and school this past summer because "I didn't think I had to" is very troubling, as is her failure to
advise him that Brian had been seeing the school social worker. [*23]Regarding this element, the Court finds that an award of custody to the Father would not interfere with the children's relationship with the Mother.
An additional consideration is the parents' conduct. Saunders v Saunders, 60 AD2d 701 (3d Dept 1997); Matter of DeLosh v DeLosh, 235 AD2d 851 (3d Dept 1997); appeal denied, 89 NY2d 813 (1997); Matter of Alice A. V Joshua B., 232 AD2d 777 (3d Dept 1996). As set forth above, the Mother continued in a domestic violence situation with D. when she lived with him in Riverhead for approximately one month and exposed the children firsthand to at least some of this violence, before she finally left. The Mother also is a drug abuser, but minimizes such use, considering it
"recreational" and not even "use." However, she did in fact smoke marijuana at a time when she was pregnant and both she and her husband are addicted to cigarettes and use marijuana. She has also been addicted to diet pills.
It has been held in this state that cigarette smoking as well as marijuana use, even on occasion, may be one of the elements considered by the Court when determining custody. In Roofeh v
Roofeh, 138 Misc 2d 889 (Sup. Ct. Nass. Cty, 1988), the Court ordered the Mother not to smoke in the children's presence and only to smoke in one particular room in the home. In Lizzio v Lizzio, 162 Misc 2d 701 (Fam. Ct, Fulton Cty, 1994), the Court forbade the offending parent from smoking tobacco anywhere in the household. This was modified sub nom Lizzio v Jackson, 226 AD2d 760 (3d Dept 1996), in which the Appellate Court held that smoking alone is not sufficient to change custody where the mother and her current husband both smoked in the children's presence. The Court ordered them to smoke only on the back porch or outside of the house. Similar decisions were rendered in Breitung v Trask, 279 AD2d 677 (3d Dept 2001) and Holden v Tillotson, 277 AD2d 735 (3d Dept 2000). See also Bjorkland v Eastman, 279 AD2d 908 (3d Dept 2001).
 In Johnita M.D. v David D.D., 191 Misc 2d 301 (NY Sup. Ct., 2002), (later proceeding sub nom DeMatteo v DeMatteo, 194 Misc 2d 640 (NY Sup Ct 2002)) the Court stated that the mother's addiction to smoking, which may result in her developing lung cancer, does not outweigh the Court's duty to protect a child. That Court pro-hibited both parties from smoking or allowing others to smoke at any time in their home or in their automobile, [*24]due to the presence
of the children, even if the children were not physically present during the time of any smoking incidents. The Court further stated unequivocally that secondhand smoke causes lung cancer and could very well do so in the children.
 DECISION
The Court finds by a fair preponderance of the credible evidence that the best interests of Adam and Brian are served by custody being with the Father and with liberal visitation to the Mother. The home environment of the Father is clearly preferable to that of the Mother; the parental guidance that the Father and his wife can provide for the children far surpasses that of the Mother and her husband; the ability of the Father to provide for the children's emotional and intellectual development far surpasses that of the Mother; the fitness of the Father to be the custodial parent vis-a-vis the Mother is beyond question; the Father's financial status and ability to provide for the children is in the Father's favor; and an award of custody to the Father will have no deleterious effect upon the children's relationship with the Mother.
The final consideration, as set forth in the case law above, is the parents' conduct. In this regard, the Court has outlined, in this decision, the Mother's conduct, her constant moving about from place to place and county to county; her abusive relationship with D. in Riverhead; her drug use; her failure to give full dis-closure to the Probation Officer regarding the officer's invest-igation; her apparent coaching of the children not to tell the Probation Officer as to M.'s existence as a tenant in the home; the Mother's husband's incompetency regarding his total inability to simply have the children arrive at school on time; and the Mother's general total lack of credibility.
 ORDER
Accordingly, it is hereby
ORDERED that full legal and physical custody of Adam and Brian shall be with the Father; and it is further
ORDERED that visitation between Adam and Brian and the [*25]Mother shall be as follows:
Alternate weekends commencing Friday at 6:00 p.m. to
Sunday at 6:00 p.m., to commence the second Friday
after this Order shall become effective.
Every Wednesday from 5:30 p.m. to 7:30 p.m.
Alternate Holidays:
New Years DayFather even yearsMother odd years
Martin Luther King Day Father odd years Mother even years
Presidents' DayFather even yearsMother odd years
Easter SundayFather odd yearsMother even years
Memorial DayFather even yearsMother odd years
July 4thFather odd yearsMother even years
Labor DayFather even yearsMother odd years
Thanksgiving DayFather odd yearsMother even years
Christmas EveFather even yearsMother odd year
(to 8:00 or 10:00 p.m.)
Christmas DayFather odd yearsMother even years.
The children shall always be with the Father on Father's Day and the Father's birthday, and shall always be with the Mother on Mother's Day and the Mother's birthday.
The parties shall alternate the school recesses with the Father having the winter recess in even years and the Mother having winter recess in odd years, and the Father having the Spring recess in odd years and the Mother in even years.
Each parent shall be entitled to up to two weeks with the children each summer, uninterrupted by visitation with the other parent, provided the Mother notifies the Father in writing by May
1st each year and the Father notifies the Mother in writing by May 15th each year concerning which weeks each intends to exercise summer visitation.
The Mother, or someone on her behalf (which other person shall be acceptable to the Father) shall pick up and return the children at the Father's residence for all visitation, and there may be such additional visitation as may be mutually agreed between the parties; and it is further
ORDERED, that the Mother shall not imbibe any alcohol or consume any illegal substances within ninety-six hours prior to any visitation, nor shall she consume nor imbibe any alcohol or illegal substances during any visitation. If the Mother foregoes [*26]visita-
tion due to the provisions of this paragraph, there shall be no "make up" visitation; and it is further
ORDERED, that the Mother shall not smoke within her home or any automobile within which the children may be transported, for at least 24 hours prior to visitation (see DeMatteo v DeMatteo, supra), and the Mother shall not allow any other person, including,
but not limited to her husband, and M., to smoke within the house or any automobile within which the children may be transported for at least 24 hours prior to visitation. THIS PROVISION OF THIS COURT ORDER IS INTENDED TO PROVIDE THAT THE CHILDREN MAY BE IN A SMOKE-FREE ENVIRONMENT AND NOT SUBJECT TO RESIDUAL OR SECOND-HAND SMOKE; and it is further
ORDERED that each party shall notify the other of any change of address or change of telephone number prior to the date of such change; and it is further
ORDERED THAT THE PARTIES SHALL NOT INVOLVE THE CHILDREN AS MESSENGERS BETWEEN THE PARTIES. THEY SHALL NOT USE THE CHILDREN AS INTERMEDIARIES TO DISCUSS VISITATION, TO EXTEND VISITATION, TO CANCEL VISITATION, OR TO CARRY MESSAGES FROM ONE PARTY TO THE OTHER; and it is further
ORDERED that the Father shall keep the Mother advised as to each and every one of the children's school, extra-curricular and religious activities, as soon as he is aware of them; and it is further
ORDERED that each parent shall have reasonable telephone communication with the children, at reasonable hours, when the children are with the other party; an it is further
ORDERED that the Mother shall have access to the children's school and medical records, and shall be kept fully apprised of them; and it is further
ORDERED THAT THE CUSTODY AND VISITATION PROVISIONS OF THIS ORDER SHALL BE EFFECTIVE IMMEDIATELY, AND THE FATHER SHALL ALSO REGISTER THE CHILDREN IN SCHOOL IMMEDIATELY.
This constitutes the Findings, Decision and Order of the Court.
Dated: December 23, 2004